The libel complained of was a circular letter published and circulated by the defendants, and was as follows:
"To the Democratic Voters of Wayne County:
"At the Democratic meeting held 3 September, 1892, for Grantham's Township, to select delegates to the county convention and nominate a tax collector, constables, etc., Joe Byrd was fraudulently (204) placed on the ticket for tax collector. Now I will let you know how he secured the nomination. A few so-called democrats, led by a so-called democrat, who, six years ago, worked so insidiously to defeat W. F. Kornegay for the Legislature — he (or they) began this nefarious work some time before the primary, and on this day negroes, radicals and boys under age were allowed to vote, and by this treacherous scheme Byrd secured the fraudulent nomination for tax collector. Now let us see who Joe Byrd is, practically. He has been for years a kicker and sorehead because he was not recognized in the distribution of offices, notwithstanding his incompetency to fill any office. Two years ago he bolted the democrats and ran, as he called it, independent, for constable, and was gloriously defeated, after taking the advantage of democrats who could not read and placing his tickets in with theirs and telling them they were voting a full democratic ticket. Besides, he mingled with the negroes and radicals, folding his name in with their tickets. The fact, is, he has been so very hungry for office for a number of years that the county commissioners took pity on him and appointed him constable *Page 150 
a few years ago, but he did not serve. Why? Because he could not furnish the $500 bond they required of him. What next? On the day the third party held their primary Byrd went to one of the leaders and asked his help to secure the nomination for tax collector on the third party ticket, assuring his third party brother that he had been in sympathy with this movement for the last two years; but a little consultation with the leaders, and Byrd learned that they had a much better and stronger man. So they turned him down. Now ain't he a beautiful democrat? Certainly. Well, let us see how his personal or private character stands. I can safely say, without fears of successful contradiction, that there is not a man, regardless of color, in (205) Grantham's Township, that cannot show up a better and purer record than Joe Byrd. I will only refer you to reliable parties who have had dealings with him and have been swindled through his monstrous lies. First, we will take poor Nancy Warrick, his wife's own aunt, who will testify that he collected her county allowance of $2 per month — and for more than one month, at that — and never paid her one cent of it. Second, ask L. B. Cotton how Byrd treated him about the pigs. Ask Job Warrick if Byrd didn't pocket $1.20 of his money arising from pig sales. C. J. Hudson will tell you how mean he treated him about the cane-mill and pocketed all the money arising from the sales of the toll syrup. Ask John Talton how the corn held out in measure he bought from Byrd. Just one year ago his landlord was forced to seize his crop by writ of claim and delivery to prevent a total destruction of the rents, after Byrd had forfeited all the stipulations of the contract, and this bill of costs, under judgment, stands today against him on Justice Broadhurst's docket. He won't pay it; too dishonest. Now, only a very few days ago he was refused credit for one gallon of cider, as he wanted to treat a crowd. But it was no treat. Henry Strickland will vouch for this assertion. Now, as for the truth, it and Byrd are entire strangers, and when he lies — and that is all the time — he will swear to it just as quick as he can reach the Book. Can give you several instances where he is guilty of perjury. Good rye liquor is what he always calls for at the bar counter, and seems to be devoted to it, notwithstanding he is a strict member of the Methodist Church, says the Lord's prayer after the preacher, and sings in a sonorous voice. Now, democrats, I beseech you, as I shall do, to work for the success of our ticket, except Joe Byrd, and all will be well. Should you so far forget yourselves as to elect Byrd tax collector, and the tax-money goes into his hands, it will be `Farewell Mr. Stamps, you'll never reach the treasury.' I could cite you many more of Byrd's dirty and insidious tricks, but think that is sufficient to convince any democrat that Joe Byrd is no democrat, besides having no private character. These are all *Page 151 
indispensable facts and will be vouched for by reliable and (206) honorable parties. Now, in conclusion, will say he actually refused to go on the stand in his own township. Why? Because he knew that the questions that would be put to him would be more than he could stomach.
 "J. C. COX, "C. J. HUDSON, "W. J. HUDSON and "T. C. OVERMAN, Democrats."
The issues submitted on the trial were as follows:
"1. Are the charges set out in the circular, or any of them, false?
"2. If so, was said circular published maliciously?
"3. What damage, if any, is the plaintiff entitled to recover?"
The court required the plaintiff to specify what charges made in the circular were libelous, and charged the jury that if they found all these specified charges false or true to make a general finding as to the first issue, but that if they found any of them true and others false, to specify in their findings as to the first issue which were true and which were false.
There was evidence offered upon the part of the plaintiff tending to show that the charges in said circular were all false, and that they were made from malice, and the defendants offered evidence tending to show that said charges were true and not made maliciously, but on the contrary, were made in good faith to inform the voters of Wayne County of the character of the man for whom their votes were solicited for a public office.
One of the charges contained in said circular was that on the day the people's party, commonly known as the third party, held their primary election in Grantham's Township, the plaintiff Byrd (207) went to one of the leaders and asked his help to secure the nomination for tax collector on the third party ticket, assuring his third party brother that he had been in sympathy with this movement for the last two years. It was admitted that the plaintiff was a candidate on the democratic ticket for tax collector for the year 1892, having been nominated after the third party primary.
The defendants offered evidence tending to prove that the plaintiff was present at the primary meeting of the third party, and had asked H. B. Keen, who was chairman of said party, to help him secure the nomination for tax collector on the third party ticket.
Exception 1. — The plaintiff Byrd was offered as a witness in his own behalf, and admitted that he was present at the third party meeting, but stated that he did not then or at any other time try to secure a nomination *Page 152 
for tax collector at their hands, and testified as follows: "On the day of said meeting Mr. McCullen asked if I wanted the nomination for tax collector. I asked him what he meant, was it in reference to the meeting to be held this p.m. He said no. I told him I would not accept the nomination except from the democratic party." The witness further stated that he did not know at the time whether McCullen was a democrat or a populist, but that he had afterwards learned that McCullen had voted the democratis ticket. To the foregoing conversation with McCullen defendants excepted.
Exception 3. — J. A. Stevens was introduced as a witness for the plaintiff, and testified as follows: "I was a candidate last year on the democratic ticket, and the plaintiff Byrd was a candidate on the same ticket. The defendant C. J. Hudson came to me during the campaign and asked me not to support Byrd as the democratic nominee. I told him that I would have to support Byrd. And he then said that (208) if I did he would not vote for me or any one else who would vote for Byrd." This was offered to show malice. Objected to by defendants. Objection overruled, and defendants excepted.
Exception 4. — The defendant C. J. Hudson was offered as a witness in behalf of the defendants, and testified to facts, which if believed, tended to prove the truth of all the charges in the said circular. Upon cross-examination the plaintiff, for the purpose of impeaching the witness, asked him the following questions: "Did you not a few years ago bring an action against E. B. Jordan to recover damage for slander, and did you not compromise that action for $175, without requiring Jordan to retract the charge of perjury?" Objected to by defendants, and objection overruled, and defendants excepted. Witness said he brought suit for slander against Jordan, and compromised it for $175. That he did not know whether or not a retraction was made, as he left that with his attorneys.
Witness then said in explanation that he brought suit against E. B. Jordan for slander, on the ground that Jordan had charged him with perjury. That he did not want Jordan's money, but only wanted to vindicate his own character. That he agreed that if Jordan would admit that he had slandered him, and pay his counsel and costs, that he would compromise the matter. The amount agreed upon was $175. That in compliance with this agreement a judgment was rendered for said amount. That Jordan neglected to pay the amount agreed upon, and conveyed his lands to his son, and that he, Hudson, was compelled to issue execution and sell the land and buy it. That after he bought it he offered to let Jordan have it back for $400, but refused to convey it to Jordan's wife, as he did not care to aid in defeating Jordan's *Page 153 
other creditors. The defendant also afterwards introduced without objection the record of the judgment in the said case of Hudson v. Jordan.
One of the counsel for plaintiff in his argument to the jury said that C. J. Hudson, in his suit against Jordan, had sold his (209) character for $175, and that the purchaser was badly cheated. The court was engaged at the time and did not hear the remark, and it was not called to the attention of the court, no exception was made thereto, and the court had no knowledge of the same until after the conclusion of the trial. There was evidence outside of the circular tending to show malice. The court, among other things charged the jury as follows:
"The language of the circular may be considered in finding whether the defendants were actuated by malice in publishing it, the fact that it imputes to the plaintiff the commission of crime, and that one of the defendants professes to have been damaged by the plaintiff may all be considered in coming to a conclusion as to the presence of malice," and the defendants excepted to so much of this charge as instructed the jury that the fact that the circular imputed a crime might be considered in determining malice.
There were special instructions asked by the defendants, which were given as requested, and also special instructions were asked by the plaintiff, some of which were given and some rejected, but no exception was made at the time of the trial. The court fully instructed the jury on the law applicable to the facts proven by the witnesses, and to the charge there was no exception made, either at the time or in the defendants' statement of the case on appeal. At the conclusion of the charge, the court asked the counsel of both sides if there was anything else they wished called to the attention of the jury, and they answered that there was not. The jury rendered a verdict for the plaintiff, assessing damages at $1,100 for which judgment was given, and defendants appealed.
The special instructions given at the request of the defendants were as follows:
"1. That the defendants, as citizens, were interested in the proper and efficient administration of the public service, and it (210) being admitted that the plaintiff was a candidate for office they had the right to criticise him and his conduct, and to inform the public as to his character and qualifications.
"2. That if the defendants honestly believed, and had probable cause to believe, that the character of the plaintiff was such that the public interest demanded his defeat, the defendants had the right to sign and circulate the circular declared on, provided the charges therein contained were true, or the defendants had probable cause to believe the same to be true, and if they signed and circulated such circular, honestly *Page 154 
believing the same to be true, and had probable cause for such belief, and moved by a desire to promote the public interest, the plaintiff is not entitled to recover any damages, and the jury will answer issue No. 3 `None.'
"3. That the circular being written by a citizen of a candidate for office, the presumption is that it was written in good faith, and the burden is upon the plaintiff to show that it was written maliciously and without probable cause.
"4. That malice is not mere anger, but is any indirect and wicked motive inducing the defendants to defame the plaintiff.
"5. That if the circular was not written for the mere purpose of defaming the plaintiff, but was written with an honest desire to inform the public, it was not written maliciously, and if the jury so believe they must answer issue No. 2 `No.'
"6. That in this case mere proof that the charges in the circular were false is not sufficient, but the plaintiff must go further and show that the defendants knew they were false at the time of writing the circular, or had no probable cause to believe them to be true. And if the jury do not believe that the defendants knew the said charges were false at the time of making them, they will answer issue No. 2 `No,' unless express malice has been proven by other testimony.
"7. That if the defendants wrote the circular, not recklessly or maliciously, or without probable cause, but in good faith and from a (211) desire to benefit the public service, the plaintiff cannot recover, although all the charges made against the defendant may be untrue.
"8. That it is to the interest of the public that the unfitness of candidates should be made public, and any citizen in good faith making charges against said candidate does no more than his duty, and will be protected by the law, provided he does not act recklessly or maliciously.
"9. That upon the charge of perjury made in the circular, the defendants having alleged said charge to be true, it is not incumbent upon the defendants to prove the truth of said charge beyond a reasonable doubt, but by a preponderance of the evidence."
1. The testimony of the plaintiff touching his conversation with McCullen was competent as corroborative of his testimony on the trial. S.v. Whitfield, 92 N.C. 831. There is no exception that the court failed to instruct the jury that they should consider it only in that view, and it will be presumed that proper instructions were given. S. v. Powell,106 N.C. 635. *Page 155 
2. The second exception was abandoned, and as to the third exception the testimony of Stevens was clearly competent, as tending to prove malice. 13 A. E. Enc., 431, sec. 4.
3. The question put to defendant on cross-examination, whether he had not compromised an action for slander for $175, without requiring the defendant to retract the charge of perjury, was an impeaching question. It was competent, as tending to impeach him as a witness to show he had put a low estimate on his own character (212) The witness was properly allowed to explain the matter. It is, however, not every question tending to disparage or disgrace a witness which is competent. The question must be, as in this instance, limited to particular acts, and even then, when it is apparent to the court that it is put merely for the purpose of annoying or harassing the witness, the trial judge may in his discretion refuse to compel him to answer. S. v. Gay, 94 N.C. 814.
4. The comment of counsel was not objected to at the time and the objection is lost. S. v. Suggs, 89 N.C. 527; S. v. Lewis, 93 N.C. 581;S. v. Powell, 106 N.C. 635; Hudson v. Jordan, 108 N.C. 10.
5. In Ramsey v. Cheek, 109 N.C. 270, the law of slander and libel is thus summarized: (1) When the words are actionable per se, unless the matter is privileged, the law presumes malice, and the burden is on the defendant to show that the charge is true. (2) If it is a case of absolute privilege, no action can be maintained, even though it could be shown that the charge was both false and malicious. (3) In a case of qualified privilege, the burden is on the plaintiff to prove both the falsity of the charge and that it was made with express malice. Or to put it more succinctly, if the words are actionable per se in "unprivileged" slander and libel, falsity and malice are prima facie presumed. If "absolutely privileged," falsity and malice are irrebuttably negatived, and if it is a case of "qualified privilege," falsity and malice must be proven.
In Ramsey v. Cheek, supra, which like the present, was a case of qualified privilege [13 A. E. Enc., 420 (11)], it was further held that in such cases, while the plaintiff must prove both the falsity of the charge and malice, and though the falsity of the charge taken alone was not sufficient to establish malice without showing further that the defendants knew it to be false, or would have known if they had used the opportunities open to them, yet "the plaintiff is not bound to prove malice by extrinsic evidence. He may rely on the words (213) of the libel itself, and on the circumstances attending its publication, as affording evidence of malice. Odgers' Slander and L., sections 277-288; 13 Am. and Eng. Enc., 431." The instruction now excepted to, that "the language of the circular which imputes to plaintiff a crime, *Page 156 
and alleges that one of the defendants had been damaged by him, may be considered by the jury in finding whether the defendants were actuated by malice in making the publication, is therefore unobjectionable. Bradsher v.Cheek, 109 N.C. 278. There was other evidence of malice, among others that of Stevens, which is not set out in the third exception. The language of the circular might, therefore, be properly considered in connection with the other evidence in passing upon the question of malice. Newell on Defamation, 770.
It should be noted that in cases of qualified privilege, though proof of falsity does not per se raise a presumption of malice, yet proof of malice takes away the protection of privilege, and shifts the burden of proving the truth of the charge upon the defendant. Ramsey v. Cheek, supra, and cases cited, 109 N.C. p. 275.
No error.
Cited: Burnett v. R. R., 120 N.C. 518; S. v. Tyson, 133 N.C. 696; S.v. Parker, 134 N.C. 215; Tise v. Thomasville, 151 N.C. 283; Muse v.Motor Co., 175 N.C. 469.
(214)