ZENO H. PONDER v. WILLIAM E. COBB
AND
FRANK E. RUNNION v. WILLIAM E. COBB
AND
OREN RICE v. WILLIAM E. COBB.

(Filed 15 June 1962.)

1. Libel and Slander § 14—

In this action by election officials to recover for libel contained in communications published by defendant charging election frauds, the evidence *is held* sufficient to be submitted to the jury on the question of whether the privileged communications were false and made with actual malice.

2. Libel and Slander § 8—

A letter written by the chairman of a major political party to the Governor and a letter written by him to the chairman of the State Board of Elections, criticizing election officials in the conduct of an election, are qualifiedly privileged.

3. Same—

As a general rule, a privileged communication does not lose its character as such unless there is excessive publication, and, since it must be assumed that every citizen of this State is interested in each State-wide election being properly held in each and every precinct of the State, a release to newspapers of the State and to a wire service

PONDER *v.* COBB AND RUNNION *v.* COBB AND RICE *v.* COBB.

by the chairman of a major political party of letters written by such chairman to the Governor and the chairman of the State Board of Elections, charging irregularities in certain precincts in a designated county, does not constitute excessive publication so as to deprive the publication of its qualified privilege.

**4. Same—**

Where a matter is qualifiedly privileged there is a presumption that the author made the statements in good faith and without malice, and the burden is upon plaintiff to establish by the greater weight of the evidence that defendant made his charges in bad faith, without probable cause, and with express malice.

**5. Libel and Slander § 13;    Elections § 4—**

The fact that election officials of a precinct, instead of keeping a poll book, kept a card index containing the respective names of the voters and, as each voted voted, separated his card without making any identifying marks on the cards and then re-inserted the cards in the alphabetical card index before the truth or falsity of charges of irregularity could be checked, is competent to be considered by the jury on the question of good faith on the part of a person making charges of fraud in the conduct of the election, such acts being improper, G.S. 163-21(5).

**6. Jury § 2—**

Whether the court should grant a motion for a special venire is addressed to its sound discretion and is not subject to review in the absence of a showing of abuse of discretion, and the fact that matters, raising questions as to the qualifications of certain jurors and improper influence upon other jurors during the course of the trial, subsequently occur does not show abuse of discretion in denying the motion when none of the matters could have been anticipated at the time the ruling on the motion was made.

**7. Libel and Slander § 13;    Evidence § 41—**

In an action by election officials for libel in the publication of communications charging them with improper conduct of an election, such officials may testify as to the way and manner in which they performed their duties in the conduct of the election in question, but they may not testify that the returns made by them correctly reflected the votes cast, since this is the very question to be decided by the jury and the testimony constitutes an invasion of the jury's province.

APPEAL by defendant from *Huskins, J.,* June Regular Civil Term 1961 of MADISON.

These three civil actions were consolidated for trial by order of the court. Each of these actions arose out of statements written by defendant William E. Cobb concerning the conduct of voting in Madison County, North Carolina, in a State-wide bond election held on 27 October 1959. The plaintiffs were, at the time of that

election, officials of a voting precinct in Madison County designated as No. 1 Township, Ward 1, commonly referred to as Marshall Precinct. Plaintiff Zeno H. Ponder was the registrar of Marshall Precinct, and plaintiffs Frank E. Runnion and Oren Rice were judges of said precinct.

The complaints in these actions are substantially the same in their material allegations. Each alleges two causes of action. The first cause of action is based upon portions of a letter dated 10 November 1959, addressed to The Honorable Luther H. Hodges, then Governor of North Carolina. This letter was written on the letterhead of the North Carolina Republican Executive Committee, and signed by defendant Cobb as chairman of that committee.

In paragraph five of the complaint in the *Ponder* case it is alleged that on or about 11 November 1959, the defendant wrote and published of and concerning the plaintiff the following:

" * * *

"Charges of fraud in Madison now make sense to any fair-minded person, regardless of politics.

"Two state-wide bonds have just been defeated by fraud in Madison. Not just Republican candidates, but the entire State of North Carolina has been thwarted by ballot-stuffing in Madison.

"Evidence lies on the surface this time. Madison County, which had no special interest in the bonds, cast more votes than neighboring Buncombe County with five times as many people and important local expenditures at stake. On the issue of State armories, Madison voted 13 to one against; on the same question the rest of the State supported the issue. Madison's fraudulent 3,000 majority against it was the killing blow.

"Another issue supported by you as Governor, by most of the leading newspapers, and by most of the people of North Carolina, was likewise defeated by a ridiculously lopsided vote from Madison County.

"Again, it was Madison's fraudulent 3,000 majority against the measure which spelled its doom.

" * * *

"One precinct in Madison County reported that 896 voters were against an issue and only 43 favored the issue. We assert that not even one-quarter that many voters appeared at that precinct to vote on October 27. Any poll of the registered voters in the Marshall Precinct will confirm this assertion.

"Any fair investigation there will prove what Republicans have claimed for years, namely: that the public of Madison County has been defrauded at the polls.

"It will also prove that in this case the people of the entire State have been cheated of their choice by popular vote.
" * * * * "

It is alleged that the defendant charged the plaintiff with the violation of the Corrupt Practices Act of 1931, and particularly G.S. 163-197, subsections 3, 8 and 9; that the matters and things published of and concerning the plaintiff as set forth in paragraph five of the complaint, were and are false and untrue and defamatory.

In paragraph eight of the first cause of action it is alleged that the matters and things published of and concerning the plaintiff by the defendant as set forth in paragraph five were published "maliciously, willfully, with ill will and in a spirit of spite and pique towards the plaintiff and were published wantonly and willfully and in reckless disregard by the defendant of the truth, without probable cause, not in good faith and in total disregard of the rights and good character, reputation and standing that the plaintiff had in the community in which he lived and with the willful intent of damaging, injuring, defaming and abusing the plaintiff; that the defendant widely published or caused to be published the said defamatory writings; that on or about the 11th day of November, 1959, the said defendant delivered said defamatory writings to North Carolina newspapers including The News-Record, Marshall, North Carolina; News and Observer, Raleigh, North Carolina; The Charlotte Observer, Charlotte, North Carolina; The Asheville Citizen, Asheville, North Carolina, and to the news services in the State, to wit, The Associated Press and other newspapers, with the unlawful and willful and malicious intent to damage the plaintiff by securing widespread publication in the newspapers of said writings and thereby holding plaintiff up to ridicule, hatred and contempt throughout the State of North Carolina, in the County of Madison, in the Town of Marshall, and in the Western part of the State of North Carolina, causing the plaintiff great damage, and that by reason of said publication in the manner and way hereinbefore set forth, this plaintiff has been damaged in the sum of $75,000."

The plaintiff also alleges that by reason of said malicious and willful publication of the matters hereinbefore set out, the defendant should be amerced in punitive damages in the sum of $75,000.

The plaintiff for a second cause of action alleges:

That on and prior to 6 May 1960, and thereafter and on 8 November 1960, the plaintiff was the duly appointed, qualified and acting registrar in a voting precinct in Madison County, North Carolina designated as No. 1 Township, Ward 1, commonly referred to as Marshall Precinct, and as such registrar was and is a public officer,

vested with all the rights and duties pertaining to the office of registrar under the election laws of North Carolina.

It is likewise alleged in the complaint in the second cause of action as it was in the first cause of action with respect to the state-wide bond election held on 27 October 1959, that the plaintiff performed his duties in accordance with the law and the rules and regulations of the North Carolina State Board of Elections on said date including the counting of the ballots, auditing thereof and the certification of returns to the Board of Elections of Madison County in his precinct, truthfully and correctly reporting the vote as follows: 43 for and 896 against the issuance of $18,891,000 in bonds for capital improvements at the State's educational institutions and agencies; 30 for and 905 against the issuance of $100,000 State Armory Capital Improvement Bonds; 30 for and 905 against the issuance of $500,000 of State Ports Bonds for port facilities at Southport, North Carolina.

It is also alleged that the defendant charged the plaintiff with the violation of the Corrupt Practices Act in substantially the same language set forth in the first cause of action.

It is further alleged in paragraph six of the second cause of action that on or about 6 May 1960 the defendant wrote the State Board of Elections a letter and published it, in which he said of and concerning the plaintiff the following: "On November 17th we presented charges with reference to the Bond Issue Election of October 27th, to the effect that there was ballot-stuffing in Madison County. Our evidence included results such as those in the Marshall Precinct of Madison County where a vote was turned in of 30 votes 'for' a bond and 905 'against.'
" * * *

"Normally we wait until after elections before challenging results from Madison County, but at this time we wish to protest results of the election of November 8, 1960. The groundwork for fraud has already been laid and, unless a determined effort by the State Board of Elections is made between now and Election Day, it is an absolute certainty that the results from Madison County will not be representative of the will of the people.
" * * *

"In view of the deplorable conditions with reference to elections in Madison County, we urge the State Board of Elections to send in special agents to observe conditions on Election Day. Realizing that it would be prohibitively expensive to put an Independent Watcher in all 23 Precincts, we urge that the following Precincts be given specific attention: Marshall Precinct (1 - 1); Laurel Fork Precinct (1 - 3); Shelton Laurel Precinct (2 - 1); Spillcorn Precinct (2 - 3);

Paint Fork Precinct (4 - 1); Middle Fork Precinct (4 - 2); Little Pine Precinct (7); Upper Spring Creek Precinct (8 - 1); Revere Precinct (10 - 2); Meadow Fork Precinct (13); Mars Hill Precinct (15); Hot Springs Precinct (9).

"If the twelve (12) Precincts above cannot be monitored, we urge that the following Precincts have special agents in attendance on Election Day: Marshall Precinct (1 - 1); Shelton Laurel Precinct (2 - 1); Upper Spring Creek Precinct (8 - 1); Meadow Fork Precinct (13); Mars Hill Precinct (15); Hot Springs Precinct (9).

"If six (6) men are not available for this type of work, we urge that the following four (4) Precincts be given special attention: Marshall Precinct (1 - 1); Shelton Laurel Precinct (2 - 1); Upper Spring Creek Precinct (8 - 1); Meadow Fork Precinct (13).

"If only one (1) man is available to observe conditions in Madison County, we would like to have him observe conditions in: Marshall Precinct (1 - 1).

"Substantially the same election officials who served in the Bond Election will be in attendance at the General Election on November 8th. * * * A long list of ridiculous returns was submitted to you on October 27th. * * *

"Unless positive action is taken by the State Board of Elections, the returns from Madison County on November 8th will again be fraudulent. * * *"

The foregoing letter dated 6 May 1960, addressed to the State Board of Elections in Raleigh, was also written on the letterhead of the North Carolina Republican Executive Committee and signed by defendant Cobb as chairman of that committee.

The allegations in paragraph nine of the second cause of action with respect to maliciousness, ill will, *et cetera,* and the newspapers and news services to which the information complained of was released for publication on 6 May 1960, and set out in paragraph six of the second cause of action, are, except for the date of publication, alleged in the identical or equivalent language set out in paragraph eight of the first cause of action. Likewise, the same amount of compensatory and punitive damages were prayed for in both actions.

The allegations with respect to punitive damages are substantially the same in both causes of action.

The defendant, in answering each of these complaints, admitted the publication of the two letters upon which these actions are based. The defendant denied that these letters charged any of the plaintiffs, either individually or in his capacity as an election official, with any violation of the election laws of this State. He further denied that the letters contained any false statements, or that they were written

maliciously, in bad faith, or without reasonable and probable cause as to the truth of the matters asserted therein.

The defendant further alleged that he had a right and privilege under the laws of the State of North Carolina to make and publish free and fair comments and criticism on matters of public interest and concern, and concerning public elections in Madison County; that the defendant in good faith and without malice and solely in the public interest in good, efficient and honest elections in Madison County and the State of North Carolina, published the letters upon which the plaintiffs base their actions.

The court entered an order denying a motion made by the defendant for a jury from some other county, as provided in G.S. 1-86. This motion was supported by affidavits of the defendant and several residents of Madison County to the effect that the defendant could not get a fair trial by jury from Madison County by reason of: (1) the widespread publicity given to these cases, and the general discussion and expression of opinion with respect thereto by residents of Madison County; (2) the influence and power of plaintiff Zeno H. Ponder, as a member of the Board of Education of Madison County, within the County; and (3) the fact that the Sheriff of Madison County, a brother of plaintiff Zeno H. Ponder, whose sympathies would lie with the plaintiffs in these actions, would be in a position to exert influence upon the jury. Several affidavits were submitted in opposition to the defendant's motion, which stated, in substance that there was no reason why the defendant could not have a fair and impartial trial by a jury from Madison County.

After a jury of twelve was chosen, sworn and impaneled, an alternate juror, Mrs. Helen Shelton, was selected and sworn in, and the jury was re-impaneled.

The first witness for the plaintiffs was Zeno H. Ponder who testified in pertinent part as follows: That he has been registrar in the Marshall Precinct since 1956 and has held the elections continuously since that time in that precinct. He testified over the objection of the defendant that the vote certified from the Marshall Precinct was a true and correct certification and that the charges made by the defendant were false.

On Cross-examination Mr. Ponder testified that "As to whether in the special bond election that is in question here on the state-wide improvement bonds, we kept a poll book showing the names of the voters of the precinct in Marshall who offered themselves to vote, * * *. We did not keep a poll book. We kept a * * * card index by removing the card of the person voting to the back of the index and at the end of the election, we knew how many and who had voted and

knew that on the day of the canvass. We did not keep a poll book. That being true, I, as Registrar in that election in the Marshall precinct, did not sign any poll book. I did not file any poll book with the Chairman of the Board of Elections following the close of the election, but the qualification is I did bring the card index and present it. It is true that this special bond election on October 27, 1959, is the only election that I have served in as Registrar of the Marshall precinct in which a poll book was not kept. * * * (W)hen a voter came in and offered to vote, I would pull out a card here, beginning with A, and take that voter's name out of this box, turn it around and put it behind the little red tag there at the back of the index * * *. There was no check mark or any other indication made upon the cards representing the names of the prospective voters as I placed them in the back end of the box to indicate anything that that voter had appeared and voted that day, and a qualification, there never has been. * * * It is true that there was no * * * mark or indication or identification of any kind upon any of these cards I speak of that would indicate that any person in this system here, card system, appeared to vote that day * * *. This is a private system that I had made up, this card index system, some three years prior to this election * * *. It was between October 27 and November 17, that I had * * * (an) interview with Mr. Raymond Maxwell, Secretary of the State Board of Elections. * * * I told Mr. Maxwell that I kept no poll book * * * but I did show him what we did keep."

Mr. Raymond C. Maxwell, Executive Secretary of the North Carolina Board of Elections, as a witness for the plaintiffs, testified that: " * * * It is correct that I was here in Madison County between October 27th, the time of the election, and the date of the meeting. I was here in Madison County approximately two days. The purpose of my being in Madison County was to make a preliminary investigation as to the charges which had been made in the paper and to the Governor and the State Board of Elections by Mr. Cobb in regard to the bond election in Madison County."

On cross-examination, this witness testified that: "I asked Mr. Ponder about where the poll book was for precinct one, ward one, or Marshall Precinct, and he told me he did not have any poll book and didn't keep any poll book. I was then trying to ascertain the people who were supposed to have voted in the Marshall precinct in this special election. We were trying to ascertain how many voted in the Marshall precinct in that election. Mr. Ponder did tell me that he in his precinct used a card system by which the names of the people who came to vote were placed on cards out of a filing cabinet he had, and that as a person came to vote, he would take out the card from

the filing system in the alphabetical arrangement and place it in the back of the box, and that that was the only system he used. We asked him to see the cards, and he said they had been placed back in their alphabetical order. I didn't see the cards then. There wasn't any use to look for them if they had been placed back in their alphabetical order."

The plaintiff Frank E. Runnion testified that he was one of the judges in Marshall Precinct No. 1. "I had served in the general elections as a precinct official prior to the voting in this special bond election of October, 1959. I have always maintained a poll book in the primary and general elections. No poll book was maintained in this special election of October 27, 1959; none but the card system. * * * As to whether I knew that we were supposed to keep a poll book, I knew that was what was always done.

"Nobody but Zeno Ponder told me that this system was all right to use. He was the man that had it. I can't tell you all of who voted on the election of these special state-wide bonds on October 27, 1959, from a single marking on one of these cards here or from any other record. * * * The minute they (the cards) were put back * * * in the alphabetical section, all information about who was supposed to have voted was immediately lost."

Oren Rice testified: "I did participate in the holding of the bond election of October 27, 1959, as a judge in the Marshall precinct. * * * They did not keep any poll book there that day. As to whether I knew they were supposed to keep a poll book, I had never held no election down there. I didn't know how they held it. * * * I have helped hold several elections up on Walnut Creek, and I kept poll books up there."

At the close of plaintiffs' evidence, the defendant moved for judgment as of nonsuit in each of these three cases. The motions were denied.

The defendant's evidence was directed primarily to showing that a lesser number of ballots were cast in Marshall Precinct in the special bond issue election of 27 October 1959 than were certified by the plaintiffs. Due to the fact that no record was kept as to those who were supposed to have voted, it was necessary for the defendant to resort to the registration book of this precinct. According to the defendant's evidence, 24 different subpoenas, containing 2,227 names supplied to the defendant as being registered voters in Marshall Precinct, were delivered for service to Sheriff E. Y. Ponder. It appears that service was obtained on only 1,272 of the persons so listed. It also appears that appeals were made in open court and over the radio station in Marshall requesting those who were registered in Marshall Precinct

to come into court and testify as to whether they had voted in the special bond election of 27 October 1959 whether or not they had been subpoened. Many persons who were served, as indicated by the return on the subpoenas, did not appear at the trial. Of the 809 persons accounted for, the evidence tends to show the following results:

Those who voted in the bond election
of 27 October 1959 ................................................................ 191
Those who did not vote in the election ............................ 508
Those who did not remember whether or
not they had voted ................................................................ 52
Those who were not registered voters
in Marshall Precinct at the time of
the election ........................................................................... 58
                                                                                        ‾809

The defendant Cobb testified: "I came to Madison County between November 10th and November 17th * * *. I did not come to Madison County prior to November 10, 1959, and talk to individuals here in the county; not, certainly, in any recent period before that, although one of them came to me down in Morganton. Clyde Roberts came to me. I can remember some of the people with whom I talked when I came here. * * * I, of course, talked to Mr. Roberts, as said before. I talked to Mr. J. H. Sprinkle, Jr. I talked to C. L. Rudisill. I talked to Dr. A. M. Ramsey. I talked to Mr. Lloyd T. Roberts, and that, to the best of my recollection, are the ones to whom I talked.

" * * * At the time I came here as a result of a report to me from Mr. Clyde Roberts, relative to the conduct of the election In the Marshall Precinct, meaning the election of October 27, 1959, I read affidavits, and I interviewed the people to whom I have referred.

"I learned that the poll book was not available. I had good reason to believe that prior to my coming here. * * *

"As a result of this preliminary investigation and reports that came to me, I wrote the letter to Governor Hodges on November 10th, based on what I considered reliable information at that time. Before the time I came here, Mr. Clyde Roberts had brought me a copy of the returns from Madison County, precinct by precinct, showing the votes as returned in this state-wide bond election. I read this copy, and with the other information he provided me, I came to the conclusions which I included in a letter to Governor Hodges of November 10th. * * *

"At the time I wrote that letter I did not know Mr. Zeno Ponder. I did not know Mr. Oren Rice. I did not know Mr. Frank Runnion. On November 10th, I did not know they were the precinct officials in

the Marshall Precinct during the state-wide bond election. In the letter that I was writing to Governor Hodges at that time, it was not my intention to refer to any individuals in Madison County. My intention was to reveal what I considered a very bad situation with reference to conduct of elections in Madison County, and to bring about corrections.

"Following that, I did issue copies of that letter of November 10th, to the press generally in North Carolina. It was an open letter. * * *"

The defendant further testified with reference to both letters, that at the time he wrote them, he did in good faith believe the substance of the matter set forth therein to be substantially true, and he so believed at the present time.

At the close of all the evidence the defendant renewed his motion for nonsuit in each of these actions. The motions were denied and the defendant excepted. From verdicts in favor of the plaintiffs, the defendant appeals, assigning error.

*A. E. Leake and William J. Cocke for plaintiffs.*
*Meekins, Packer & Roberts and Clyde M. Roberts for defendant.*

DENNY, C.J.  The trial of these consolidated cases began on 26 June 1961 and ended on 14 July 1961. The record contains 802 pages, exclusive of numerous exhibits. The appellant's brief contains 111 pages and, in addition thereto, an appendix containing 50 pages of in chambers proceedings in connection with several separate motions made by the defendant for a mistrial based on alleged misconduct or other alleged cause for the disqualification and removal of certain members of the jury who had been impaneled to sit and hear the consolidated cases. The appellees' brief contains 154 pages, and the appellant has ten assignments of error based on 198 exceptions. We deem it unnecessary to undertake a *seriatim* discussion of all the questions raised. However, we will undertake to consider and discuss those exceptions and assignments of error which we deem essential to a proper disposition of this appeal.

The defendant assigns as error the refusal of the court below to sustain his motion for judgment as of nonsuit in each of these cases, interposed at the close of the plaintiffs' evidence and renewed at the close of all the evidence. A careful consideration of the evidence adduced in the trial below leads us to the conclusion that it was sufficient to carry the cases to the jury. Hence, this assignment of error is overruled.

Assignment of error No. 8 challenges the correctness of the following portions of the court's charge to the jury:

"A communication regarding the character or conduct of a public officer made to a person or persons having no authority to afford redress in the matter is not privileged under the law of this state, and so, the court instructs you, ladies and gentlemen, that in this case the defendant had neither an absolute privilege nor a qualified privilege to make a false, defamatory statement about either of these plaintiffs to the newpapers of North Carolina." (EXCEPTION 159)

"He would have had a qualified privilege to take a grievance about the way and manner in which elections in Madison County are conducted to the State Board of Elections, or to the Governor. We will assume for the purpose of this trial that the Governor was a person having authority to afford some redress in the matter, to do something about his grievance, and, had his communications been only to the Governor and only to the State Board of Elections, then he would have had a qualified privilege, the law would have assumed he was acting in good faith and without malice and would have placed the burden on the plaintiff to satisfy the jury that he acted in bad faith and was actuated by actual malice." (EXCEPTION 160)

"The defendant admitted that he released these matters to the newspapers of North Carolina on each occasion. The court instructs you that under the law in this State, the contents of these releases are defamatory on their face and he had no absolute or qualified privilege to make them." (EXCEPTION 161)

One of the leading cases in this jurisdiction dealing with the doctrine of privileged communications in the law of libel and slander is *Ramsey v. Cheek*, 109 N.C. 270, 13 S.E. 775. In that case the defendant, resided in Hillsboro, North Carolina, wrote a letter to the Superintendent of Census charging that a Mr. Hawkins had appointed in the district a "large majority of enumerators, extreme Democrats, ballot-box stuffers, among them MURDERERS and drunkards"; that he had appointed in Durham a man named Ramsey who "murdered, since the war * * * two *Union soldiers* while they were *asleep*. This same man was the leader in defrauding me and Mr. Nichols out of our election last election," *et cetera.*

When this case came on for trial, the court held that the communication was privileged and that there was no evidence of malice. The plaintiff submitted to a nonsuit and appealed. *Clark, J.*, later *C.J.*, speaking for the Court, said: "In libel and slander, if the words are actionable *per se*, the law presumes malice, and the burden is on the defendant to show that the charge is true, unless the communication is privileged. Then the rule is otherwise.

"Privileged communications are of two kinds:

"1. *Absolutely Privileged* — Which are restricted to cases in which it is so much to the public interest that the defendant should speak out his mind fully and freely, that all actions in respect to the words used are absolutely forbidden, even though it be alleged that they were used falsely, knowingly, and with express malice. This complete immunity obtains only where the public service or the due administration of justice requires it, e.g., words used in debate in Congress and the State Legislatures, reports of military or other officers to their superiors in the line of duty, everything said by a judge on the bench, by a witness in the box, and the like. In these cases the action is absolutely barred. 13 A. & E., 406.

"2. *Qualified Privilege* — In less important matters where the public interest does not require such absolute immunity, the plaintiff will recover in spite of the privilege, if he can prove that the words were not used *bona fide*, but that the defendant used the privileged occasion artfully and knowingly to falsely defame the plaintiff. Odgers Libel and Slander, 184. In this class of cases, an action will lie only where the party is guilty of falsehood and express malice. 13 A. & E., supra. Express malice is malice in fact, as distinguished from implied malice, which is raised as a matter of law by the use of words libelous *per se,* when the occasion is not privileged. Whether the occasion is privileged is a question of law for the court, subject to review, and not for the jury, unless the circumstances of the publication are in dispute, when it is a mixed question of law and fact."

The Court further held that the defendant's communication was " * * * one of qualified privilege. * * * It was not absolutely privileged. But he was an American citizen interested in the proper and efficient administration of the public service. He had, therefore, the right to criticise public officers, and if he honestly and *bona fide* believed, and had probable cause to believe, that the character and conduct of plaintiff were such that the public interest demanded his removal, he had a right to make the communication in question, giving his reasons therefor, to the head of the department. The presumption of law is that he acted *bona fide,* and the burden was on the plaintiff to show that he wrote the letter with malice or without probable cause. * * *"

The Court also said: "Proof that the words are false is not sufficient evidence of malice unless there is evidence that the defendant knew, at the time of using them, that they were false. *Fountain v. Boodle,* 43 E.C.L., 605; *Odgers, supra,* 275. That the defendant was mistaken in the charges made by him on such confidential or privileged occasion, is, taken alone, no evidence of malice. *Kent v. Bongartz,* 2 Am. St. Reports, 870, and cases cited.

" * * * If, however, there are means at hand for ascertaining the truth of the matter, of which the defendant neglects to avail himself, and chooses rather to remain in ignorance when he might have obtained full information, there will be no pretense for any claim of privilege. * * * The malice may be proved by some *extrinsic* evidence, such as ill-feeling or personal hostility or threats and the like on the part of the defendant towards the plaintiff. But the plaintiff is not bound to prove malice by extrinsic evidence. He may rely on the words of the libel itself, and on the circumstances attending its publication as affording evidence of malice. *Odger's, supra,* 277-288; 13 A. & E., 431. * * *

"If the party knows the charge to be false, or makes it without probable cause, this is evidence of malice." See also *Bailey v. Charleston Mail Asso.,* 126 W. Va. 292, 27 S.E. 2d 837, 150 A.L.R. 348.

In the case of *Byrd v. Hudson,* 113 N.C. 203, 18 S.E. 209, the action was based on a circular letter published and circulated by the defendants to the Democratic voters of Wayne County, North Carolina, in which the defendants charged the plaintiff with a crime. The defendants appealed from a verdict in favor of the plaintiff. This Court found no error in the trial below. In considering the appeal, among other things, this Court said: "The instruction now excepted to, that 'the language of the circular which imputes to plaintiff a crime, and alleges that one of the defendants had been damaged by him, may be considered by the jury in finding whether the defendants were actuated by malice in making the publication,' is therefore unobjectionable. *Bradsher v. Cheek,* 109 N.C. 278 (13 S.E. 777). There was other evidence of malice, * * * which is not set out in the third exception. The language of the circular might, therefore, be properly considered upon the question of malice. Newell on Defamation, 770.

"It should be noted that in cases of qualified privilege, though proof of falsity does not *per se* raise a presumption of malice, yet proof of malice takes away the protection of privilege, and shifts the burden of proving the truth of the charge upon the defendant. *Ramsey v. Cheek, supra,* and cases cited * * *."

In *Alexander v. Vann,* 180 N.C. 187, 104 S.E. 360, the defendant wrote a letter to the Sheriff of Pitt County with regard to alleged misconduct of the plaintiff, a deputy sheriff of Hertford County. The Sheriff of Pitt County had no authority or control over the conduct of a deputy sheriff in Hertford County. The Court said: "As we understand it, a privileged communication is one which, under ordinary circumstances, would be defamatory made to another in pursuance of a duty, political, judicial, social, or personal, so that an action for libel or slander will not lie though the statement be false unless actual

malice be proved in addition. The great underlying principle of the doctrine of privileged communications rests in public policy. Qualified privilege extends to all communications made *bona fide* upon any subject-matter in which the party communicating has an interest, or in reference to which he has some moral or legal duty to perform. The occasion on which the communication was made may rebut the inference of malice or it may tend to prove malice, and that the defendant was actuated by motives of personal spite or ill-will independent of the occasion on which the communication was made. Mr. Newell says, sec. 497, that a communication to be privileged must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or proper cause. The learned author further says, sec. 501, that if the communication, whether written or oral, be of such a character that the expressions in it are beyond what common sense indicates to be justifiable, it cannot be held as privileged. In regard to communications containing charges against public officers, Mr. Newell says: 'It is the duty of all who witness any misconduct on the part of a magistrate or any public officer to bring such misconduct to the notice of those whose duty it is to inquire into and punish it; and, therefore, all petitions and memorials complaining of such misconduct, if prepared in good faith and *forwarded to the proper authorities,* are privileged.' " (Emphasis added)

Other cases in which privileged communications were considered, see *Gattis v. Kilgo,* 128 N.C. 402, 38 S.E. 931; s.c., 140 N.C. 106, 52 S.E. 249; *Logan v. Hodges,* 146 N.C. 38, 59 S.E. 349, 14 Ann. Cas. 103; *Lewis v. Carr,* 178 N.C. 578, 101 S.E. 97; *S. v. Pub. Co.,* 179 N.C. 720, 102 S.E. 318; *Elmore v. R.R.,* 189 N.C. 658, 127 S.E. 710; *Hartsfield v. Hines,* 200 N.C. 356, 157 S.E. 16; *Stevenson v. Northington,* 204 N.C. 690, 169 S.E. 622; *Montgomery Ward & Co. v. Watson* (4th C.C.A.), 55 F. 2d 184. See also, Law and Press (Revised Edition), by Lassiter, Section 1-26, page 63, *et seq.* Cf. *Yancey v. Gillespie,* 242 N.C. 227, 87 S.E. 2d 210.

What constitutes a privileged occasion is defined in 53 C.J.S., Libel and Slander, section 87, pp. 142 and 143, as "an occasion when for the public good and in the interests of society one is freed from liability that would otherwise be imposed on him by reason of the publication of defamatory matter; one on which a privileged person is entitled to do something which no one not within the privilege is entitled to do on that occasion; and it has been said that it is not the publication itself, but the occasion of its publication, that is privileged," citing *Dupont Engineering Co. v. Nashville Banner Pub. Co.* (D. C. Tenn.), 13 F. 2d 186.

This same authority says in the above volume, section 89, pp. 143 and 144, dealing with the subject of qualified privilege: "Qualified privilege exists in a larger number of cases than does absolute privilege. It relates more particularly to private interests; and comprehends communications made in good faith, without actual malice, with reasonable or probable grounds for believing them to be true, on a subject matter in which the author of the communication has an interest, or in respect to which he has a duty, public, personal, or private, either legal, judicial, political, moral, or social made to a person having a corresponding interest or duty. Briefly stated, a qualifiedly privileged communication is a defamatory communication made on what is called an occasion of privilege without actual malice, and as to such communications there is no civil liability, regardless of whether or not the communication is libelous per se or libelous per quod. * * *"

In light of the fact that the defendant William E. Cobb, at the time in question, was chairman of one of the major political parties in North Carolina and in the nation, he had the right to comment upon and criticize the conduct of election officials in Madison County on the occasion involved, if he honestly and *bona fide* believed and had probable cause to believe that the election officials in Madison County had falsely and fradulently certified incorrect returns of the votes cast in the State-wide bond election of 27 October 1959.

Furthermore, since the letters involved in these actions were addressed to the Governor of the State and to the State Board of Elections, proper parties from or through whom redress might be expected, we hold they were qualifiedly privileged. Any statements made by the defendant when he appeared before the State Board of Elections at the hearing on 17 November 1959 were likewise qualifiedly privileged. Moreover, since this was a State-wide bond election, and whether all the citizens of the State were particularly interested in the approval or rejection of the bond issues in this election, we must assume that every citizen of North Carolina is interested in each State-wide election being properly held in each and every precinct in the State. Therefore, we hold that the defendant did not lose his qualified privilege by releasing these letters to the press in North Carolina. The general rule is that a privileged communication does not lose its character as such or become an unprivileged communication unless there is excessive publication.

It is said in 53 C.J.S., Libel and Slander, Section 97, subsection (b) 3, page 155: "Where the communication does not concern the public at large, but only one person or a limited number of persons, the rule has been laid down that it will lose the privilege which it might other-

wise have had if it is published by means of a newspaper or circulars issued to the general public. Indeed, the same rule has been applied where, although the matter is of public interest within a limited territory, the publication takes place in a newspaper having a circulation beyond that territory. However, if the newspaper circulation beyond the territory is merely incidental and the communication is otherwise privileged, the privilege is not destroyed. * * *" See also 33 Am. Jur., Libel and Slander, Sections 187 and 188, pp. 178 and 179.

In the case of *Farm Bureau Fed., et al., v. National F.U.S. Corp., et al.* (10th C.A.), 198 F. 2d 20, 33 A.L.R. 2d 1186, the appellants had charged the Farmers Union with Communist domination. This charge had been published in certain newspapers and pamphlets. The Court said: "Appellants do not claim absolute privilege for their publications. They do claim, however, a qualified or conditional privilege, which they say under the facts entitle them to a directed verdict. The Utah courts, following the great weight of authority, hold that publications dealing with political matters, public officials or candidates for office, are entitled to a measurable privilege because of the public interest involved. As to this class of publications, the law raises a *prima facie* presumption in favor of the privilege. *Williams v. Standard-Examiner Publishing Co.*, 83 Utah 31, 27 P. 2d 1, *Derounian v. Stokes*, 10 Cir., 168 F. 2d 305.

"The question whether the comment on or criticism of matters of public concern are fair and privileged, or malicious and libelous, is usually a question to be determined by the jury under all the circumstances, subject of course to the control of the court. Restatement of Law of Torts, Sections 614 and 618."

Likewise, in the case of *Coleman v. MacLennan*, 78 Kan. 711, 98 P. 281, 20 L.R.A. (N.S.) 361, 130 Am. St. Rep. 390, the plaintiff, in 1904, held the office of Attorney General of the State and was a candidate for re-election at the general election which occurred in the following November. By virtue of his office, he was a member of the commission charged with the management and control of the State School Fund. The defendant was the owner and publisher of the Topeka State Journal, a newspaper published at Topeka and circulated both within and without the State. In the issue of the date mentioned appeared an article purporting to state facts relating to the plaintiff's official conduct in connection with a school fund transaction, making comment upon them and drawing inferences from them. Deeming the article to be libelous the plaintiff brought an action for damages against the defendant, alleging that the matter published was false and defamatory, and that its publication was the fruit of malice. Among other defenses the defendant pleaded facts which he claimed rendered the

article and its publication privileged. From a verdict in favor of the defendant the plaintiff appealed and challenged the correctness of the following instruction: " 'As you have already observed from the statement of the case, defendant claims, as his first defense, that the publication is what is known in law as "privileged." A communication made in good faith, upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty, is privileged. And, where an article is published and circulated among voters for the sole purpose of giving what the defendant believes to be truthful information concerning a candidate for public office, and for the purpose of enabling such voters to cast their ballot more intelligently, and the whole thing is done in good faith, and without malice, the article is privileged, although principal matters contained in the article may be untrue in fact and derogatory to the character of the plaintiff, and in such a case the burden is on the plaintiff to show actual malice in the publication of the article. If you believe then from the evidence in this case that on August 20, 1904, plaintiff was a candidate for re-election to the office of Attorney General, and that defendant published said article for the sole purpose of giving to the voters of Kansas what he believed to be truthful information concerning the acts of the Attorney General, and only for the purpose of enabling such voters to cast their ballots more intelligently, and that the defendant made all reasonable effort to ascertain the facts before publishing the same, and that the whole thing was done in good faith, and without malice toward plaintiff, and if you believe that the bulk of the circulation of the said paper was within the state of Kansas, and that its circulation outside of the state of Kansas was only incidental, then I instruct you that your verdict must be for the defendant, although you may believe that the principal matters contained in said article are untrue in fact and derogatory to the character of the plaintiff; but, on the contrary, if you should find from the evidence that said article was published with a malicious intent to willfully wrong and injure plaintiff, then the fact that the article was a privileged one would constitute no defense to this action, and the plaintiff would be entitled to recover such damages as the evidence shows him to have sustained by reason of said publication.' " The Court upheld the instruction.

In *Evening Post Co. v. Richardson*, 113 Ky. 641, 68 S.W. 665, the defendant newspaper published an article charging the plaintiff with corruption in the discharge of his duties as an election official. The trial court sustained a general demurrer to the defendant's plea of qualified privilege. On appeal, this was held for error. The Court quoted with

approval from *Miner v. Tribune Co.*, 49 Mich. 358, 13 N.W. 773, as follows: " 'The defendant contends that to call public attention to a matter that so vitally concerns the public is a matter of privilege, and that, by the presumption of law, its motives in doing so must be deemed proper, and not actuated by malice. The trial judge denied this claim altogether. In doing so he put the case on precisely the same footing with publications which involve merely private gossip and scandal. The truth was allowed as a defense, if made out; and so it would have been if the injurious charge which was published had been one in which the public was not concerned. If there is no difference in moral quality between the publication of mere personal abuse and the discussion of matters of grave public concern, then this judgment may be right and should be affirmed. But it is very certain, I think, that no declaration of this or any other court can convince the common reason that this distinction is not plain and palpable. Few wrongs can be greater than the public detraction which has only abuse, or profit from abuse, for its object. Few duties can be plainer than to challenge public attention to official disregard of principles which protect public and personal liberty.' " See also *Bereman v. Power Pub. Co.*, 93 Colo. 581, 27 P. 2d 749, 92 A.L.R. 1024, and cited cases; Anno — Libel — Privilege, 92 A.L.R. 1029.

This assignment of error is well taken and is sustained. Therefore, it was error in the trial below not to give the defendant the benefit of the presumption that he made the statements contained in the letters involved in good faith and without malice. *Ramsey v. Cheek, supra.* The burden should have been placed upon the plaintiffs to establish by a preponderance of the evidence or by its greater weight that the defendant made his charges in bad faith, without probable cause and with express malice. Unless these facts are so established the plaintiffs are not entitled to recover.

According to the evidence disclosed on the record herein, each of the plaintiffs in these consolidated actions is an experienced election official, particularly the plaintiff Ponder. Each one of them testified that the State-wide bond election held on 27 October 1959 in the Marshall Precinct was the only election in which he had ever served when a poll book had not been kept. These plaintiffs clearly violated the mandatory provisions of G.S. 163-21, subsection 5, which reads as follows: "One of the judges of election shall keep a poll book in which shall be entered the name of every person who shall vote in the primary or election. The poll and registration books shall be signed by the registrar and judges of election at the close of any primary or election and filed with the chairman of the county board of elections."

Therefore, in our opinion, the fact that no poll book was kept in this precinct, and no identifying mark was made on the cards containing the respective names of the voters who voted in said election, and the further fact that these cards were re-inserted in the general index before the truth or falsity of the charges with respect to improper election returns could be checked, constitute conduct for the consideration of the jury on the question of the defendant's good faith in making his statements with respect to the returns certified by these plaintiffs from the Marshall precinct. If a poll book had been kept, it would have been a comparatively simple matter to have proven the correctness or the falsity of the returns made in this precinct. We do not condemn the use of the card system *per se*, but the manner in which it was used in Marshall precinct on 27 October 1959 in the State-wide bond election, coupled with the failure to keep a poll book, would seem to be indefensible.

The defendant assigns as error the denial of his motion for a special venire of jurors from another county for the reasons set out hereinabove in the statement of facts. This was a matter to be determined in the sound discretion of the trial judge. His Honor's discretion in this matter is not subject to review in the absence of a showing that he abused his discretion. No evidence of abuse of discretion has been shown. In this connection, however, if the able and patient judge who tried this case below could have foreseen the numerous hearings he would be compelled to conduct during the progress of the trial in connection with charges of alleged misconduct on the part of members of the jury, and which would make it necessary to remove one juror from the panel based on a finding that she was disqualified to serve and to substitute the thirteenth juror after the trial had been in progress four and one-half days, and the further fact that another member of the jury would go on a fishing trip over the week end of July 4th with the son-in-law of one of the plaintiffs; that another member of the jury would be charged with having made disqualifying statements after he had been summoned for jury duty, and a fourth member would be charged with having been subjected to improper outside influences during the course of the trial, he doubtless would have granted the defendant's motion or removed this case to another county for trial. But none of these matters could be anticipated at the time he made his ruling on this motion. Hence, this assignment of error is overruled.

Since there must be a new trial, one further comment is appropriate. Plaintiff Runnion, over the objection of defendant, was asked and permitted to answer a question as follows:

"Q. * * * (S)tate whether or not that return there correctly and accurately reports the vote cast in the bond election in number one township, ward one on October 27, 1959?

. "A. It does."

Like questions were asked and similarly answered by the other two plaintiffs. Whether or not the return made by plaintiffs reflected "correctly" the "vote cast" was the chief bone of contention in this action, and the conclusion was for the jury. A witness will not be allowed to give his opinion on the very question to be decided by the jury. *Jones v. Bailey*, 246 N.C. 599, 99 S.E. 2d 768; *Cheek v. Brokerage Co.*, 209 N.C. 569, 183 S.E. 729; *Trust Co. v. Store Co.*, 193 N.C. 122, 136 S.E. 289. Stansbury criticizes the rule, but makes the following comment: "If there must be an opinion rule, its application in each case ought to depend upon the practicability of breaking down the facts into their component details, and this in turn will depend, among other things, upon the importance of the proffered testimony in its relation to the outcome of the suit. The closer it approaches to the ultimate questions of whether the plaintiff shall recover, and if so how much, the greater the importance of consuming whatever time is necessary to get the exact picture before the jury; and when the picture has been secured there is no need for the witness's 'opinion.' * * *" Stansbury, North Carolina Evidence, section 126, page 243. However, plaintiffs may testify fully as to their conduct of the election, that they served as election officials, describe balloting procedures and state what irregularities they observed, if any, describe in detail how the ballots were counted, discuss the making of the abstract signed by them and state whether or not it was in accordance with the count, state whether or not the return was placed in a sealed envelope and whether the envelope was delivered at the proper time to the county board of elections. In other words, they may fully testify to the way and manner in which they performed their duties as required General Statutes, Chapter 163, Articles 13 and 14. However, they may not then draw the conclusion which is for the jury.

The questions raised by other assignments of error may not recur when the case is tried again, and we therefore do not decide or discuss them.

New trial.

HIGGINS, J., concurring in result. I am in agreement with the excellent opinion of the Chief Justice except in one particular. The Court holds the plaintiffs were incompetent to testify the original return which they filed and certified to the County Board of Elections was true and correct. When first offered, the defendant objected to the

testimony and stated as the ground of the objection, "It is absolutely leading, for one thing, on his own witness." The Court now says the question and answer invaded the province of the jury.

This is the setting: The witnesses (plaintiffs) were the election officials. They were under oath. They held the election, counted the ballots, recorded, and certified the results. The original return was introduced in evidence and was before the witnesses.

The defendant charged the election was fraudulent and the return false. When the plaintiffs were called as witnesses each testified the return from Marshall Precinct 1-1 on all the propositions submitted was true and correct. Each knew — not by deduction, not by what someone else said or did — but by first-hand knowledge whether the record spoke the truth. Their evidence no more invaded the province of the jury than the testimony of a plaintiff that the defendant borrowed $500 from him and had never paid it back.

The cases cited in the opinion do not support the exclusion of the testimony. In *Jones v. Bailey*, 246 N.C. 599, 99 S.E. 2d 768, the witness attempted to testify as to which driver had the right of way — a mixed question of law and fact. In *Cheek v. Brokerage Co.*, 209 N.C. 569, 183 S.E. 729, the investigating officer tried to tell the jury that the two vehicles ran together 18 inches across the center line. Of course, he could properly testify as to what he found by way of debris, skid marks, etc. He could not testify by process of deduction as to the point of a collision which he did not see. In *Trust Co. v. Store Co.*, 193 N.C. 122, 136 S.E. 289, a witness attempted to testify there was no fraud in a stock sale. The witnesses attempted to draw deductions which invaded the province of the jury.

Ponder, Rice, and Runnion made the records. They counted the ballots, recorded the totals, and certified the return — not by deduction, not by inference, not by reliance upon what some other person did or said — but from their own first-hand knowledge. They, so far as the record shows, were the only ones with first-hand knowledge. I think their testimony was properly admitted in reply to the charge their return was crooked.