IN THE SUPREME COURT OF NORTH CAROLINA

No. 403PA21

Filed 23 May 2024

LOUIS M. BOUVIER, JR., KAREN ANDREA NIEHANS, SAMUEL R. NIEHANS, and JOSEPH D. GOLDEN

v.

WILLIAM CLARK PORTER, IV, HOLTZMAN VOGEL JOSEFIAK TORCHINSKY PLLC, STEVE ROBERTS, ERIN CLARK, GABRIELA FALLON, STEVEN SAXE, and the PAT MCCRORY COMMITTEE LEGAL DEFENSE FUND

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 279 N.C. App. 528, 865 S.E.2d 732 (2021), affirming in part and reversing in part an order entered on 14 January 2020 by Judge R. Allen Baddour Jr. in Superior Court, Guilford County, granting plaintiffs' motion for summary judgment as to defendants' affirmative defenses and denying defendants' motion for summary judgment, and remanding the case. Heard in the Supreme Court on 11 April 2024.

*Dowling PLLC, by Craig D. Schauer, for defendant-appellants Holtzman Vogel Josefiak Torchinsky PLLC, Steve Roberts, Erin Clark, Gabriela Fallon, and Steven Saxe; and Blanchard, Miller, Lewis & Isley, P.A., by Philip R. Isley, and Higgins Benjamin, PLLC, by Robert N. Hunter Jr., for defendant-appellant Pat McCrory Committee Legal Defense Fund.*

*Womble Bond Dickinson (US) LLP, by Pressly M. Millen and Ripley Rand, and Southern Coalition for Social Justice, by Jeffrey Loperfido, for plaintiff-appellees.*

*Jeanette K. Doran for North Carolina Institute for Constitutional Law, amicus curiae.*

NEWBY, Chief Justice.

In this case we decide the breadth of protections afforded to individuals engaged in the pursuit of an election protest. Applying long-settled, bedrock principles, we hold that the absolute privilege broadly protects all individuals involved in any aspect of election protests from defamation claims. This includes, but is not limited to, those who research, assess, strategize, approve, facilitate, direct, prepare, file, or prosecute election protests. In so doing, we reiterate what this Court has long held: the absolute privilege attaches by virtue of the proceeding in which the statement is published. We therefore reject plaintiffs' baseless attempt to constrict the absolute privilege's protections. Accordingly, plaintiff's lawsuit, which seeks to impose civil defamation liability for statements contained in election protests, thereby discouraging citizens from guarding the integrity of their elections, is absolutely barred. The Court of Appeals' decision as to the issue before this Court is therefore reversed, and the matter is remanded to the Court of Appeals with instructions to further remand to the trial court to dismiss the matter with prejudice.

The opening text of Article I of our state constitution "declare[s]" our rights so that "the great, general, and essential principles of liberty and free government may be recognized and established." N.C. Const. art. I. The text acknowledges that "[a]ll political power is vested in and derived from the people" and that the people "have the inherent, sole, and exclusive right of regulating the internal government." *Id.* art. I, §§ 2–3. The people exercise this "exclusive right" through one of our most

fundamental political processes—elections. Indeed, North Carolinians elect hundreds of state and local officials in all three branches of government.[1]

Since 1776 the state constitution has recognized the importance of elections and their integrity in the Declaration of Rights. *See id.* art. I, §§ 9 (Frequent Elections), 10 (Free Elections); N.C. Const. of 1868, art. I, §§ 10 (Free Elections), 28 (Frequent Elections); N.C. Const. of 1776, Declaration of Rights, §§ 6 (Free Elections), 20 (Frequent Elections). Notably, the Free Elections Clause declares that "[a]ll elections shall be free," N.C. Const. art. I, § 10, and guarantees "that voters are free to vote according to their consciences without interference or intimidation," *Harper v. Hall*, 384 N.C. 292, 363−64, 886 S.E.2d 393, 439 (2023). An election is "free" when (1) each voter is able to vote according to his or her judgment, and (2) the votes are *accurately* counted. *Id.* at 363, 886 S.E.2d at 439. Inherently, votes are not accurately counted if ineligible voters' ballots are included in the election results.

Similarly, the state constitution has always protected the people's right to petition the government. N.C. Const. art. I, § 12; N.C. Const. of 1868, art. I, § 25; N.C. Const. of 1776, Declaration of Rights, § 18. Article I, Section 12, guarantees that "[t]he

---

[1] *E.g.*, N.C. Const. art. II, §§ 2, 4 (election of state senators and representatives); *id.* art. III, §§ 2(1) (election of the Governor and Lieutenant Governor), 7 (election of the secretary of state, auditor, treasurer, superintendent of public instruction, attorney general, commissioner of agriculture, commissioner of labor, and commissioner of insurance); *id.* art. IV, §§ 16 (election of Supreme Court justices, Court of Appeals judges, and superior court judges), 18 (election of district attorneys); *id.* art. VII, § 2 (election of sheriffs); N.C.G.S. § 7A-140 (2023) (election of district court judges); *id.* § 153A-34 (election of county commissioners); *id.* § 160A-66 (election of mayors and city council members).

people have a right to assemble together to consult for their common good, to instruct their representatives, and to apply to the General Assembly for redress of grievances." N.C. Const. art. I, § 12. The United States Constitution likewise recognizes the people's right to petition the government. U.S. Const. amend. I. This fundamental right is directly "connect[ed] to the mechanics of popular sovereignty," John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 58 (2d ed. 2013), because it protects the right to "express[   ] one's views to government officials" and to "influence the[ir] actions . . . whether in the legislative, executive, or judicial branch," *Cheryl Lloyd Humphrey Inv. Co., LLC v. Resco Prods., Inc.*, 377 N.C. 384, 384, 388, 858 S.E.2d 795, 797, 799 (2021).

The General Assembly has recognized that free elections and the right to petition are vital to maintaining the public's trust and confidence in our system of self-government. Specifically concerning elections, the General Assembly has established various statutory processes by which North Carolina citizens may alert county boards of elections to perceived problems in elections. *See, e.g.*, N.C.G.S. §§ 163-84 to -90.3 (2023) (voter challenges); -91 (Help America Vote Act of 2002 complaints); -127.1 to -127.6 (challenges to candidacy). One of these processes—known as "election protests"—seeks to balance the public's interest in achieving accurate election results with the need to finalize those results in a short period of time. *See generally id.* §§ 163-182.9 to -182.12, -182.14 (2023).

Election protests enable North Carolina citizens to freely raise concerns about the election process and give the county boards of elections a chance to address those concerns before vote counts are finalized. The process is simple so that everyone, not just lawyers, can use it. *See id.* § 163-182.9(a). Consequently, any candidate or registered, eligible voter may file an election protest. *Id.*

Election protests are meant "to assure that an election is determined without taint of fraud or corruption and without irregularities that may have changed the result of an election." *Id.* § 163-182.12. To this end, an election protest may address any "irregularity" or "misconduct" in the election process, *id.* §§ 163-182.9(b), -182.10, including the counting and tabulation of ballots cast by ineligible voters, *see id.* §§ 163-182.9(b)(2), (4), -182.10(d)(2)e, -182.12, -182.13(a)(1). Voters may be ineligible for many reasons, including when they have already voted in the election.[2] *Id.* § 163-87(2).

Once a citizen files a protest, the county board of elections determines whether the alleged irregularity actually occurred, and if so, what remedy is necessary. *See id.* § 163-182.10. Where the irregularity affects the accuracy of the election results, the county board of elections may order the ineligible ballots excluded from the vote

---

[2] Certain categories of individuals are also categorically ineligible to vote, such as minors, noncitizens, nonresidents, convicted felons, and deceased individuals. N.C. Const. art. VI, §§ 1-2; N.C.G.S. §§ 163-55(a), -85(c), -87 (2023). Additionally, a voter is generally ineligible to vote in a political party's primary election if he or she is not a registered member of that party. *See* N.C.G.S. § 163-59 (2023). Even if a prospective voter meets all eligibility requirements, he or she must also be "legally registered" to vote. *Id.* § 163-54; *see also id.* § 163-82.1(a).

total, and in some instances, may order a full recount. *Id.* § 163-182.10(d)(2)e. County boards of elections must resolve all election protests very quickly because they must authenticate and certify the election results within a few weeks of election day. *See id.* §§ 163-182.5 to -182.6, -182.10(a)(2)–(3), -182.15(a)–(b). Election protests become even more significant in very close elections because they could affect the outcome. *See id.* § 163-182.10(d)(2)d–e, -182.13(a).

In 2016, North Carolina experienced a very close election between gubernatorial candidates Roy Cooper and Pat McCrory. After election day, McCrory trailed Cooper by approximately 5,000 votes—a vote margin that likely could have entitled McCrory to a recount. *See id.* § 163-182.7(c)(2). On 10 November 2016, the Pat McCrory Committee established defendant Pat McCrory Committee Legal Defense Fund (the Defense Fund) in anticipation of postelection activities relating to the gubernatorial election. The Defense Fund was tasked with obtaining and funding election consultants and overseeing their efforts to assess potential irregularities in the election.

The Defense Fund retained Jason Torchinsky and four associate attorneys of defendant Holtzman Vogel Josefiak Torchinsky PLLC (Holtzman Vogel) to assist the Defense Fund in any postelection activities.[3] These attorneys received voting data

---

[3] The only defendants in the present appeal are Holtzman Vogel, the associate attorneys (collectively, with Holtzman Vogel, law-firm defendants), and the Defense Fund. We refer to them collectively as defendants. Torchinsky was not named as a defendant in the case. Although William Clark Porter IV was originally named as a defendant, he did not

and information from the Republican National Committee and the North Carolina Grand Old Party that identified potentially ineligible voters. With this information, the Defense Fund instructed the associate attorneys to work with local citizens to submit election protests. Relevant to this case, the associate attorneys submitted election protests in Brunswick County and Guilford County to challenge votes cast by individuals who may have voted more than once.

Defendant William Clark Porter IV, a citizen of Guilford County, talked with one of the associate attorneys about submitting an election protest in Guilford County. On 17 November 2016, Porter authorized that associate attorney to sign and submit the election protest on his behalf to the Guilford County Board of Elections. The Guilford County protest alleged "that nine . . . individuals cast ballots in both North Carolina and another state" and that "th[o]se ballots were erroneously counted and tabulated by the G[uilford] County Board of Elections." Specifically, the Guilford County protest accused plaintiffs Karen Andrea Niehans, Samuel R. Niehans, and Louis Maurice Bouvier Jr., among others, of having voted in another state. The

---

appeal from the favorable decision of the Court of Appeals, which held the absolute privilege barred plaintiffs' claims against him, and he is not a party before this Court.

The record indicates that the associate attorneys were not licensed or authorized to practice law in North Carolina at the time of the events of this case. They insist, however, that they did not need to be because their conduct in this case did not amount to the practice of law. Because their status as attorneys is irrelevant to the consideration of this matter, we do not resolve this question.

Guilford County protest alleged that the supposed misconduct "affected or cast doubt upon the results of the protested election."

Similarly, Joseph Agovino, a citizen of Brunswick County, discussed submitting an election protest with one of the associate attorneys. On 17 November 2016, Agovino signed the protest and authorized the associate attorney to submit the protest on his behalf to the Brunswick County Board of Elections. The Brunswick County protest alleged that plaintiff Joseph Daniel Golden "cast [a] ballot[ ] in both North Carolina and another state" and that his ballot was "erroneously counted and tabulated by the B[runswick] County Board of Elections." The Brunswick County protest alleged that the purported misconduct "affected or cast doubt upon the results of the protested election."

The Guilford and Brunswick County Boards of Elections each preliminarily determined that the respective protests established probable cause to believe that a violation of election law (or some other irregularity or misconduct) had occurred. The Guilford and Brunswick County Boards of Elections then scheduled full hearings to adjudicate the election protests.

The Guilford County Board of Elections held its hearing on 21 November 2016. None of the associate attorneys attended. On 29 November 2016, the Guilford County Board of Elections dismissed the Guilford County protest "due to lack of any evidence presented."

The Brunswick County Board of Elections held its hearing on 22 November 2016. Once again, none of the associate attorneys attended. Before the board could render a decision on the Brunswick County protest, Agovino withdrew the protest.

Following these events, plaintiffs received negative media attention and adverse reactions in their respective communities. Accordingly, on 8 February 2017, Bouvier and the Niehans filed a complaint asserting a libel claim against Porter and seeking punitive damages pursuant to N.C.G.S. § 1D-1.

On 13 April 2017, Porter moved to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. Specifically, Porter argued that statements made in election protests are made in the due course of a quasi-judicial proceeding and therefore are immunized by the absolute privilege. On 9 June 2017, the trial court denied Porter's motion to dismiss. In his answer, Porter subsequently reasserted the absolute privilege among other affirmative defenses, including the right to petition the government.

Subsequently, plaintiffs filed an amended complaint on 9 November 2017, adding Golden as a plaintiff and law-firm defendants and the Defense Fund as defendants. The amended complaint reiterated the original claims for libel and punitive damages. Plaintiffs also asserted that defendants conspired to commit the "overt and wrongful acts" of "mak[ing] the statements and tak[ing] the actions described above . . . to delay certification of the election and suggest that voter fraud affected the election results."

Defendants moved to dismiss the amended complaint pursuant to the absolute privilege, among other defenses. On 6 June 2018, the trial court denied their motions to dismiss.[4]

On 12 and 16 July 2018, defendants submitted individual answers to plaintiffs' amended complaint. In their respective answers, each defendant asserted the absolute privilege along with other affirmative defenses, including the right to petition the government.

On 3 September 2019, plaintiffs moved for partial summary judgment on all the affirmative defenses, and all defendants, including Porter, jointly cross-moved for summary judgment on plaintiffs' claims. On 14 December 2020, the trial court denied defendants' motion and granted plaintiffs' motion, dismissing all affirmative defenses. Defendants, including Porter, appealed the trial court's order, which denied their claim to the absolute privilege.

The Court of Appeals unanimously affirmed in part, reversed in part, and remanded the case.[5] *Bouvier v. Porter*, 279 N.C. App. 528, 548, 865 S.E.2d 732, 745 (2021). First, the Court of Appeals noted that the absolute privilege is generally

---

[4] As noted in footnote 8, defendants, including Porter, could have appealed the trial court's order denying their motions to dismiss.

[5] Before addressing the merits, the Court of Appeals concluded that it had appellate jurisdiction over defendants' interlocutory appeal. *Bouvier v. Porter*, 279 N.C. App. 528, 540, 865 S.E.2d 732, 740 (2021). The Court of Appeals analogized the absolute privilege to other forms of "immunity from suit," which it recognized as "a substantial right . . . [that] would be lost[ ] absent interlocutory review." *Id.* at 539, 865 S.E.2d at 739 (quoting *Topping v. Meyers*, 270 N.C. App. 613, 617, 842 S.E.2d 95, 99 (2020)).

applicable to statements made in the course of a judicial or quasi-judicial proceeding that are sufficiently relevant and pertinent to that proceeding. *Id.* at 541, 865 S.E.2d at 740–41. It then concluded that election-protest proceedings before county boards of elections are quasi-judicial proceedings and that "[c]onsequently, as a general principle, [the] absolute privilege applies to defamatory statements made in the course of an election protest filed with a [c]ounty [b]oard of [e]lections." *Id.* at 541–42, 865 S.E.2d at 741.

Second, the Court of Appeals concluded the statements at issue were relevant and pertinent to the election-protest proceedings. *Id.* at 543–44, 865 S.E.2d at 742. It stated that it "[could ]not conclude [the statements] were so 'palpably irrelevant' to an election protest that 'no reasonable man [could] doubt [their] irrelevancy or impropriety.'" *Id.* (third and fourth alterations in original) (quoting *Scott v. Statesville Plywood & Veneer Co.*, 240 N.C. 73, 76, 81 S.E.2d 146, 149 (1954)). "Consequently," the Court of Appeals concluded that the "absolute privilege applie[d] to the election protests containing the allegedly defamatory statements in this case." *Id.* at 544, 865 S.E.2d at 742.

Although it concluded that statements in the election protests were covered by the absolute privilege, the Court of Appeals then adopted, without any citations to this Court's caselaw, plaintiffs' theory that the absolute privilege only "applies to statements *by participants* in judicial and quasi-judicial proceedings made within the scope of those proceedings." *Id.* at 544, 865 S.E.2d at 743 (emphasis added). Plaintiffs

crafted this "participation" requirement by relying on inapposite Court of Appeals precedent, the *Restatement (Second) of Torts*, and caselaw from other jurisdictions. With plaintiffs' newly created "participation" requirement in mind, the Court of Appeals separately analyzed whether each defendant sufficiently participated in the quasi-judicial proceeding. *Id.* at 544–48, 865 S.E.2d at 742–45.

First, the Court of Appeals held that the "absolute privilege most clearly applie[d] to . . . Porter" because he "was the actual protestor." *Id.* at 545, 865 S.E.2d at 743. As to law-firm defendants, the Court of Appeals highlighted that they "disclaimed acting as attorneys for the protestors," "did not appear at the hearings," and did not make the allegedly defamatory statements "while they were participating as counsel in the election[-]protest proceeding." *Id.* at 546, 865 S.E.2d at 744. Thus, the Court of Appeals concluded that law-firm defendants did not qualify as "participants" under plaintiffs' novel theory. *Id.* at 545–47, 865 S.E.2d at 743–45. Finally, the Court of Appeals stated that the Defense Fund merely authorized the election-protest strategy, which it did not consider to be "participation." *See id.* at 548, 865 S.E.2d at 745. Therefore, the Defense Fund also did not fulfill the newfound "participation" requirement. *Id.* In sum, the Court of Appeals affirmed the trial court's order denying law-firm defendants and the Defense Fund the absolute privilege, but it reversed the trial court's order denying Porter the absolute privilege. *Id.*

On 18 November 2021, law-firm defendants and the Defense Fund filed a petition for discretionary review with this Court, challenging the newly devised "participation" requirement. Plaintiffs did not seek review of the Court of Appeals' conclusion that Porter was protected by the absolute privilege. In fact, at oral argument, plaintiffs acknowledged that the absolute privilege precluded their lawsuit against Porter.[6] *See* Oral Argument at 38:50–41:54, *Bouvier v. Porter* (No. 403PA21), https://www.youtube.com/watch?v=CBX9oVMTLUg [hereinafter Oral Argument]. This Court allowed defendants' petition on 4 April 2023.

The issue presented is whether, like Porter, defendants are protected by the absolute privilege for the allegedly defamatory statements made in the election protests and are, therefore, entitled to summary judgment. Before this Court, plaintiffs do not challenge the Court of Appeals' conclusions that the absolute privilege applied to statements in the election protests in this case. That is, plaintiffs do not challenge that the statements were made in the due course of a quasi-judicial proceeding and were relevant and pertinent to that proceeding. And as explained below, we agree with the Court of Appeals on those issues. Therefore, the only question for this Court is whether the Court of Appeals erred when it adopted plaintiffs' new "participation" requirement for the application of the absolute privilege. *See* N.C. R. App. P. 16(a), 28(a)–(c).

---

[6] This candid admission begs the question: if plaintiffs knew that they were precluded from bringing a defamation action against Porter, why did they pursue that claim?

This Court reviews orders granting or denying summary judgment de novo. *Quality Built Homes Inc. v. Town of Carthage*, 369 N.C. 15, 18, 789 S.E.2d 454, 457 (2016). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2023). "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000). A movant is entitled to judgment as a matter of law when "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense," or when it is shown "through discovery that the opposing party cannot produce evidence to support an essential element of her claim." *Id.* "The movant's papers are carefully scrutinized," and the nonmovant's factual allegations are taken as true and viewed in a light most favorable to that party. *Id.*

As a cause of action, defamation claims protect people from untrue statements that damage or degrade their reputations. Generally, "[i]n order to recover for defamation, a plaintiff . . . must show that the defendant [(1)] caused injury to the plaintiff [(2)] by making false, defamatory statements [(3)] of or concerning the plaintiff[ ] [(4)] [that] were published to a third person." *Desmond v. News & Observer Publ'g Co.*, 375 N.C. 21, 41, 846 S.E.2d 647, 661 (2020) (first alteration in original) (quoting *Desmond v. News & Observer Publ'g Co.*, 241 N.C. App. 10, 16, 772 S.E.2d

128, 135 (2015)). Defamation encompasses two separate torts: "libel" and "slander." 20 Strong's N.C. Index 4th: *Libel and Slander* § 1, at 541 (2017). Libel is a written defamatory statement, and slander is an oral defamatory statement. *Id.* In this case, plaintiffs alleged libel.

Even if a plaintiff establishes all the essential elements of libel, however, a defamation action will not lie if "the circumstances under which the statement was published confer upon the publisher a privilege to publish it." *R.H. Bouligny, Inc. v. United Steelworkers of Am., AFL-CIO*, 270 N.C. 160, 170, 154 S.E.2d 344, 354 (1967). Since before our independence, the common law has recognized "privileges" that protect the publication of defamatory speech. *See Shelfer v. Gooding*, 47 N.C. (2 Jones) 175, 178–84 (1855); *Dobson*, 352 N.C. at 81, 530 S.E.2d at 834. These privileges protect the public's interest in the "free expression and communication of ideas" when it outweighs the interest in protecting individuals' reputations. *R.H. Bouligny*, 270 N.C. at 170, 154 S.E.2d at 354.

One such privilege is the "absolute privilege," which applies when the public has an interest in the defendant speaking "his mind fully and freely." *Ramsey v. Cheek*, 109 N.C. 270, 273, 13 S.E. 775, 775 (1891). When the absolute privilege applies, "all actions in respect to the words used are absolutely forbidden"—even if the plaintiff alleges that the defendant published them falsely, knowingly, and with express malice. *Id.* This powerful protection is only granted in certain scenarios, such as debates in the General Assembly, communications between military or law

enforcement officers and their superiors in the line of duty, and "everything said by a judge on the bench, by a witness in the box*, and the like.*" *Id.* (emphasis added). Relevant to this case, a defamatory statement is absolutely privileged if it is made in the due course of a judicial or quasi-judicial proceeding and is relevant and pertinent to the subject matter of the proceeding. *Scott*, 240 N.C. at 76, 81 S.E.2d at 149; *Jarman v. Offutt*, 239 N.C. 468, 472, 80 S.E.2d 248, 251 (1954).

Broadly stated, statements are "made in the due course" of a proceeding if they are made in the regular progression of an action or proceeding or are "communications relevant to [a] proposed judicial proceeding[ ]." *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 674, 355 S.E.2d 838, 842 (1987).[7] Importantly, this requirement encompasses statements that predate the formal commencement of an action or proceeding. *See id.* at 674, 355 S.E.2d at 842–43.

Statements made in the due course of a judicial or quasi-judicial proceeding must also be "relevant" and "pertinent" to the subject matter of the proceeding, which is a question of law for the courts. *Scott*, 240 N.C. at 76, 81 S.E.2d at 149. A statement

---

[7] *See also, e.g., Scott*, 240 N.C. at 76, 81 S.E.2d at 149 (applying the absolute privilege to "pleadings and other papers filed"); *Jarman*, 239 N.C. at 472, 80 S.E.2d at 251 (applying the absolute privilege to "affidavit[s] [that] are pertinent to matters involved in a judicial proceeding"); *Wall v. Blalock*, 245 N.C. 232, 232–33, 95 S.E.2d 450, 451–52 (1956) (applying the absolute privilege to "words spoken by an attorney in the course of a trial," including arguments before the jury); *Harman v. Belk*, 165 N.C. App. 819, 824–25, 600 S.E.2d 43, 47–48 (2004) (applying the absolute privilege to statements made in depositions); *Burton v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 702, 706, 355 S.E.2d 800, 802–03 (1987) (applying the absolute privilege to relevant out-of-court communications between parties or their attorneys).

is irrelevant or impertinent if it is "so palpably irrelevant to the subject matter of the controversy that no reasonable man can doubt its irrelevancy or impropriety." *Id.* Stated another way, a statement is relevant and pertinent "[i]f it is so related to the subject matter of the controversy that it may become the subject of inquiry in the course of the [proceeding]." *Id.*

Notably, "the [absolute privilege's] protection from liability to suit attaches by reason of the setting in which the defamatory statement is spoken or published. The privilege belongs to the occasion. It does not follow the speaker or publisher into other surroundings and circumstances." *R.H. Bouligny*, 270 N.C. at 171, 154 S.E.2d at 354.

The justification for the absolute privilege is rooted in the commonsense notion that in scenarios such as judicial and quasi-judicial proceedings, people must be able to communicate freely, uninhibited by the fear of retribution in the form of a defamation suit. *See Shelfer*, 47 N.C. (2 Jones) at 177–81. Indeed, the purpose of judicial and quasi-judicial proceedings is to discover the truth in a matter and do justice accordingly. *See In re Miller*, 357 N.C. 316, 334, 584 S.E.2d 772, 785–86 (2003). To accomplish this laudable end, North Carolina, like other American jurisdictions, employs an adversarial system of justice. *State v. Lawrence*, 365 N.C. 506, 512, 723 S.E.2d 326, 330 (2012). In the crucible of judicial or quasi-judicial proceedings, parties pit their evidence and arguments against each other, *id.*, and in that arena, "partisan advocacy on both sides of [the] case . . . best promote[s] the ultimate objective"—truth and justice. *Herring v. New York*, 422 U.S. 853, 862, 95 S. Ct. 2550, 2555 (1975). For

this reason, "complete immunity" attaches "[w]here the public service or the due administration of justice require it," *Ramsey*, 109 N.C. at 273, 13 S.E. at 775, and "the law does not allow recovery of damages, actual or punitive, occasioned by the defamatory speech or publication," *R.H. Bouligny*, 270 N.C. at 170, 154 S.E.2d at 354. With these principles in mind, we hold that all defendants in this case are shielded by the absolute privilege.

This Court has said that county boards of elections are quasi-judicial bodies. *See James v. Bartlett*, 359 N.C. 260, 264, 607 S.E.2d 638, 641 (2005); *Burgin v. N.C. State Bd. of Elections*, 214 N.C. 140, 146, 198 S.E. 592, 595–96 (1938); *cf. Ponder v. Joslin*, 262 N.C. 496, 501, 138 S.E.2d 143, 147 (1964) (stating the State Board of Elections acts as a quasi-judicial agency when resolving election protests). Therefore, election protests before county boards of elections are quasi-judicial proceedings. The Court of Appeals correctly reached this conclusion, and plaintiffs do not argue otherwise.

Moreover, the statements complained of were relevant and pertinent to the subject matter of the election-protest proceedings. The allegations contained in the election-protest forms were obviously destined to "become the subject of inquiry in the course of the [proceedings]." *Scott*, 240 N.C. at 76, 81 S.E.2d at 149. Indeed, the statements' allegations were in and of themselves the subject matter of the election-protest proceedings. No one could seriously argue that the statements were "so palpably irrelevant to the subject matter of the controversy that no reasonable

man can doubt [their] irrelevancy or impropriety." *Id.* Again, the Court of Appeals correctly reached this conclusion, and plaintiffs do not ask this Court to revisit that court's determination.

Accordingly, defendants were protected by the absolute privilege because the statements at issue were made in the due course of quasi-judicial proceedings and relevant and pertinent to the proceedings' subject matter. Because there are no genuine issues as to any material fact, and because defendants have shown that they are entitled to judgment as a matter of law, the trial court erred when it denied all defendants summary judgment.[8] The Court of Appeals' analysis should have ended there, and it should have remanded to the trial court with an instruction to dismiss the action with prejudice.[9]

Instead, the Court of Appeals, in response to novel "participation" arguments advanced by plaintiffs, concluded that defendants are not entitled to the absolute privilege because law-firm defendants did not participate "as counsel" and the Defense Fund did not "participat[e] in the election protest." *Bouvier*, 279 N.C. App.

---

[8] Given that the absolute privilege so clearly applies to this case, plaintiffs' libel claims should have been dismissed with prejudice much earlier at the pleading stage under Rule 12(b)(6). *Cf. Scott*, 240 N.C. at 77, 81 S.E.2d at 149–50. Nevertheless, defendants elected not to appeal the trial court's denials of their motions to dismiss and proceeded to summary judgment. Throughout the course of this appeal, defendants only raised issues pertaining to the trial court's summary judgment order. Accordingly, we resolve the appeal as presented. *See* N.C. R. App. P. 16(a), 28(a), 28(b)(6).

[9] Plaintiffs predicated their civil conspiracy claim entirely on the "overt and wrongful acts" of the alleged libel. Because defendants are immune from the defamation suit by virtue of the absolute privilege, defendants are also entitled to summary judgment regarding plaintiffs' civil conspiracy claim. *See Dobson*, 352 N.C. at 83, 530 S.E.2d at 835.

at 546, 548, 865 S.E.2d at 744–45. This baseless participation requirement concocted by plaintiffs has no foundation in this Court's jurisprudence. Rather, plaintiffs rely on the *Restatement (Second) of Torts* and appellate decisions from other jurisdictions, and they selectively lift quotes from decisions that do not actually articulate the rule plaintiffs advance. Plaintiffs fail to point to any precedent from this Court or the Court of Appeals requiring a defendant to "participate" as a party, counsel, or witness to obtain the benefit of the absolute privilege.

Accordingly, we reject plaintiffs' unsupported argument. Instead, we reiterate what this Court has long held: "The privilege belongs to the occasion," and "the protection from liability to suit attaches *by reason of the setting in which the defamatory statement is spoken or published.*" *R.H. Bouligny*, 270 N.C. at 171, 154 S.E.2d at 354 (emphasis added); *see also Perry v. Perry*, 153 N.C. 265, 267, 69 S.E. 130, 131 (1910); *Shelfer*, 47 N.C. (2 Jones) at 176–77. The public has an interest in judicial and quasi-judicial bodies arriving at the truth in matters brought before them and in the "due administration of justice." *Ramsey*, 109 N.C. at 273, 13 S.E. at 775. This interest is especially strong when the quasi-judicial proceeding implicates accuracy in elections. To that end, the absolute privilege must apply broadly to *anyone* involved in any aspect of an election protest, even if they did not actually "participate" as a party, counsel, witness, or the like at a subsequent proceeding.

This Court's caselaw specifically requires the broad application of the absolute privilege. For example, in *Jarman v. Offutt*, a husband initiated a "lunacy proceeding"

before a clerk of superior court to involuntarily commit his wife. 239 N.C. at 470, 472, 80 S.E.2d at 250, 252. The husband contacted a physician who had evaluated the wife, and the physician completed an affidavit stating that the wife was "suffering from a mental disease" and was "a fit subject for admission into a hospital for the mentally disordered." *Id.* at 470–71, 80 S.E.2d at 250. The husband did not follow through on the involuntary-commitment proceeding, however, *see id.* at 471, 80 S.E.2d at 250–51, and he never filed the physician's affidavit with the clerk, *id.* at 473–74, 80 S.E.2d at 252. Rather, the wife found the defendant's affidavit "folded up and sticking behind a tool cabinet in the husband's barber shop." *Id.* at 471, 80 S.E.2d at 250–51. The wife then filed a defamation action against the physician. *Id.* at 468, 80 S.E.2d at 248. This Court held that the absolute privilege protected the physician because he "made the affidavit . . . in the due course of a proceeding previously instituted." *Id.* at 473–74, 80 S.E.2d at 252. Significantly, this Court applied the absolute privilege to the physician in *Jarman* even though his affidavit was never filed and he never actually "participated" in the proceeding.

Not only does this Court's caselaw compel the broad application of the absolute privilege, but plaintiffs also acknowledged its propriety. At oral argument, this Court asked plaintiffs' counsel whether a doctor would be protected by the absolute privilege if he advises a prospective medical-malpractice plaintiff that another doctor deviated from the applicable standard of care but is never called to be a witness at trial. In response, plaintiffs' counsel acknowledged that the absolute privilege would protect

the advising doctor from any subsequent defamation suit. Plaintiffs' counsel attempted to distinguish that hypothetical situation from the facts in this case, however, as a "consultation . . . about a prospective lawsuit" involving "a person who is or could be a potential witness." Oral Argument at 23:27–27:45.

We see no material distinction, however, between the hypothetical described above, the facts in *Jarman*, and the facts presented in this case. Like the doctor in *Jarman* and the advising doctor in the hypothetical, defendants were involved in the preliminary stages of the election protests but did not play a role at the election-protest hearings. Generally, the Defense Fund oversaw the postelection activities, approving of the election-protest strategy and facilitating exchanges of information. For their part, law-firm defendants assessed data, consulted with the actual protestors about the evidence, prepared the election protests, and filed the protests with the county boards of elections on the protestors' behalf. Moreover, defendants in this case were potential witnesses for the election-protest hearings. *See* N.C.G.S. § 163-182.10(c)(2) (2015) ("The county board may receive evidence at the hearing from any person with information concerning the subject of the protest."); *see also id.* § 163-182.10(c)(2) (2023) (same). Simply put, defendants were inextricably intertwined with the election protests in this case. Because "the privilege belong[ed] to the occasion"—i.e., to the election protests—defendants are still entitled to the absolute privilege even if they did not "participate" as a party, counsel, or witness at the election-protest hearings. *R.H. Bouligny*, 270 N.C. at 171, 154 S.E.2d at 354.

The broad application of the absolute privilege's protection is especially critical in fast-paced proceedings like election protests. After the polls close, the initial counting of votes begins "immediately," and precinct officials provide a preliminary report of the vote count to the county boards of elections "as quickly as possible." N.C.G.S. § 163-182.2(a)(1), (5) (2015); *see also id.* § 163-182.2(a)(1), (5) (2023) (same). Then the boards of elections conduct "canvasses" to "determin[e] that the votes have been counted and tabulated correctly" and "authenticat[e] . . . the official election results." *Id.* § 163-182.5(a) (2015); *see also id.* § 163-182.5(a) (2023) (same).

The timing of election protests is measured relative to the county boards of elections' canvasses, which are normally held ten days after an election. *Id.* § 163-182.5(b) (2023); *cf. id.* § 163-182.5(b) (2015). At the latest, an election protest may be filed by "5:00 P.M. on the second business day after the county board of elections has completed its canvass and declared the results." *Id.* § 163-182.9(b)(4) (2015); *see also id.* § 163-182.9(b)(4) (2023) (same).

"[A]s soon as possible after the protest is filed," the county board of elections meets to preliminarily determine (1) whether the protest "substantially complies" with statutory filing requirements, and (2) whether the protest "establishes probable cause" to believe that a violation of election law, an irregularity, or misconduct has occurred. *Id.* § 163-182.10(a)(1) (2015); *see also id.* § 163-182.10(a)(1) (2023) (same). If both requirements are met, the county board of elections schedules a full hearing

to resolve the matter. *Id.* § 163-182.10(a)(1) (2015); *see also id.* § 163-182.10(a)(1) (2023) (same).

Relevant here, if the protest is filed before the canvass and concerns the counting and tabulation of votes, the county board of elections must resolve the protest before the canvass is completed. *Id.* § 163-182.10(a)(2) (2015); *see also id.* § 163-182.10(a)(2) (2023) (same). The county board of elections may pause the canvass to ensure election protests are resolved before the canvass is completed, but it "shall not delay the completion of the canvass for more than three days unless approved by the State Board of Elections." *Id.* § 163-182.10(a)(2) (2015); *see also id.* § 163-182.10(a)(2) (2023) (same). In all election protests, however, swiftness is the order of the day. County boards of elections must expeditiously resolve election protests to facilitate appeals and the timely certification of elections. *See id.* §§ 163-182.11, -182.14 to -182.15 (2015); *see also id.* §§ 163-182.11, -182.14 to -182.15 (2023).

Accordingly, election protests proceed rapidly, and the process does not lend itself to exhaustive discovery and absolute precision. Indeed, many times a prospective protestor must solicit the help of numerous individuals to evaluate voluminous evidence extracted from many different sources. Without the absolute privilege, the specter of civil defamation liability would chill these individuals' willingness—and undermine their ability—to engage in the election-protest process.

Such an outcome is especially unacceptable because election protests are a valuable tool in safeguarding North Carolinians' right to free elections. The public rightfully expects that we have a "government of the people, by the people, for the people." Abraham Lincoln, Gettysburg Address (Nov. 19, 1863). This requires integrity throughout the election process. Thus, citizens must be able to voice their concerns. In light of the public's strong interest in ensuring that all individuals can fully and freely collaborate and communicate in the course of an election protest, we hold that the absolute privilege's protection extends to everyone involved in that process, not just those who act as party, counsel, or witness.

Undoubtedly, in fast-paced scenarios like election protests, mistakes will be made, and the evidence will not always confirm election protestors' suspicions. Yet it remains true that "[i]n a political process meant to address public concerns, a commitment to 'free and open debate' means other parties are free to counter selfish or misleading speech with speech of their own." *Cheryl Lloyd Humphrey Land Inv. Co.*, 377 N.C. at 388–89, 858 S.E.2d at 799 (quoting *Connick v. Myers*, 461 U.S. 138, 145, 103 S. Ct. 1684, 1689 (1983)). In judicial and quasi-judicial proceedings, an aggrieved party is remedied by "expos[ing] the falsity of the statements and submit[ting] alternative evidence," *id.* at 390, 858 S.E.2d at 800—which is exactly what happened in this case. Ultimately, plaintiffs were vindicated because the protests were either withdrawn or dismissed. Further subjecting defendants to civil defamation liability for election protests impermissibly strikes "fear of retribution" in

the minds of other concerned citizens, which will assuredly chill their future willingness to "voice their concerns to the government" in future elections. *Id.*

The statements at issue were made in the due course of a quasi-judicial proceeding and were both relevant and pertinent to its subject matter. Defendants are therefore entitled to the protection of the absolute privilege.[10] Accordingly, the decision of the Court of Appeals creating a "participation" requirement is reversed. The matter is remanded to that court with instructions to further remand to the trial

---

[10] Although not at issue in this case, we observe that statements concerning matters of public concern generally enjoy the protection of the "qualified privilege." *See generally Stewart v. Nation-Wide Check Corp.*, 279 N.C. 278, 285, 182 S.E.2d 410, 415 (1971) ("The essential elements [for the qualified privilege to exist as a defense to defamation claims] are . . . [1] good faith, [2] an interest to be upheld, [3] a statement limited in its scope to this purpose, [4] a proper occasion, and [5] publication in a proper manner and to the proper parties only." (quoting 50 Am. Jur. 2d *Libel and Slander* § 195 (1970))). Indeed, the state constitution's Free Speech Clause grants everyone a qualified privilege "to comment on matters of public interest and concern, provided he does so fairly and with an honest purpose. Such comments or criticisms are not libelous, however severe in their terms, unless they are written maliciously." *Yancey v. Gillespie*, 242 N.C. 227, 229–30, 87 S.E.2d 210, 212 (1955) (quoting *Hoeppner v. Dunkirk Printing Co.*, 172 N.E. 139, 140 (N.Y. 1930)). To that end, this Court has recognized that when a publication concerns "political matters, public officials[,] . . . candidates for office," or other "matters of public concern," *Ponder v. Cobb*, 257 N.C. 281, 297, 126 S.E.2d 67, 79 (1962) (quoting *Utah State Farm Bureau Fed'n v. Nat'l Farmers Union Serv. Corp.*, 198 F.2d 20, 22 (10th Cir. 1952)), the publisher is given "the benefit of [a] presumption that he made the statements . . . in good faith and without malice," *id.* at 299, 126 S.E.2d 67, 80. Indeed, "[t]he burden . . . [is] placed upon the plaintiffs to establish by a preponderance of the evidence[,] or by its greater weight[,] that the defendant made his charges in bad faith, without probable cause[,] and with express malice." *Id.* at 299, 126 S.E.2d at 80. Notably, this Court held that the qualified privilege extended to "a statement made in good faith by the chairman of a political party charging misconduct of election officials, the statement being made to public officials from or through whom redress might be expected, even though the statement [was] also made public in a press release." *R.H. Bouligny*, 270 N.C. at 172, 154 S.E.2d at 355 (citing *Ponder*, 257 N.C. at 281, 126 S.E.2d at 67).

-26-

court for dismissal with prejudice and for any other proceedings warranted by this disposition.

REVERSED AND REMANDED.

Justices EARLS and RIGGS did not participate in the consideration or decision of this case.