IN THE SUPREME COURT OF NORTH CAROLINA

No. 58PA23

Filed 23 May 2025

JAMES HWANG, M.D.

v.

BRUCE CAIRNS, THE UNIVERSITY OF NORTH CAROLINA, THE
UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, and UNIVERSITY OF
NORTH CAROLINA HEALTH CARE SYSTEM

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous, unpublished decision of the Court of Appeals, No. COA22-31 (N.C. Ct. App. Jan. 17, 2023), affirming orders entered on 6 August 2021 by Judge John M. Dunlow in Superior Court, Durham County. On 30 August 2023, the Supreme Court allowed defendant Dr. Cairns's conditional petition for discretionary review as to the Court of Appeals' dismissal of his cross-appeal from an order entered on 4 April 2019 by Judge Lora Cubbage in Superior Court, Durham County. Heard in the Supreme Court on 17 April 2024.

*Zaytoun & Ballew, PLLC, by Robert E. Zaytoun, Matthew D. Ballew, and Zachary R. Kaplan, for plaintiff-appellant/cross-appellee.*

*Jeff Jackson, Attorney General, by Lindsay Vance Smith, Deputy Solicitor General; and Hartzog Law Group LLP, by Katie Weaver Hartzog, for defendant-appellee/cross-appellant Bruce Cairns.*

*No brief submitted for defendant-appellees the University of North Carolina, the University of North Carolina at Chapel Hill, and the University of North Carolina Health Care System.*

BERGER, Justice.

Defendant Bruce Cairns, M.D., was employed as a division chief in the Department of Surgery and Medical Director of the Jaycee Burn Center (UNC Burn Center) with UNC Hospitals. In this appeal he seeks to extend public official immunity to administrators working in a public university setting. While exceptions apply, public official immunity generally shields qualifying individuals from personal liability for tortious conduct in execution of discretionary acts committed while acting within the scope of his or her governmental duties.

But the doctrine of public official immunity does not extend to "employee[s] of a governmental agency . . . since the compelling reasons for the nonliability of a public officer, clothed with discretion, are entirely absent." *Miller v. Jones*, 224 N.C. 783, 787 (1945). Thus, a governmental employee may be "personally liable for negligence in the performance of his or her duties proximately causing an injury." *Isenhour v. Hutto*, 350 N.C. 601, 610 (1999) (cleaned up).

Because defendant is not a public official clothed with immunity, we reverse the decision of the Court of Appeals affirming the trial court's grant of summary judgment in favor of defendant and remand.

## I. Factual & Procedural Background

At all relevant times herein, defendant was a tenured professor, Chair of the Faculty, Medical Director of the UNC Burn Center, and a division chief in the

Department of Surgery with the University of North Carolina School of Medicine. As division chief and Medical Director, defendant supervised plaintiff James Hwang, M.D.

Plaintiff was a surgeon with the UNC Burn Center from 2010 until 2017. In June 2017, plaintiff resigned to accept a similar position with another medical center. Plaintiff alleged that his decision to leave resulted from, in part, defendant's relentless harassment and creation of a hostile work environment.

When plaintiff announced that he was leaving the UNC Burn Center, three of plaintiff's colleagues planned and paid for a surprise going-away party at an off-campus restaurant. The party was not an official work event. Party invitations were sent to UNC Burn Center employees' work emails and featured a photoshopped picture of plaintiff shirtless and riding a llama. Party decorations included posters with plaintiff's head photoshopped onto the bodies of barely dressed men. Hosts of the party hired a male stripper to serve as a topless waiter at the party. According to party attendees, the stripper did not fully undress; he danced with party attendees while serving appetizers and beverages including Ensure shakes, a non-alcoholic protein shake that plaintiff was often teased for drinking. UNC Burn Center employees, family members, and plaintiff's wife attended. Defendant was invited but did not attend.

Two weeks after the party, a complaint was filed with the UNC School of Medicine Human Resources Department alleging that plaintiff had exhibited

inappropriate, disruptive, and sexually offensive behavior during the party. Specifically, the complaint stated that social media posts showed plaintiff touching female coworkers' breasts and posing with the stripper. The UNC School of Medicine conducted an investigation and interviewed plaintiff, defendant, and two of the party hosts.

The final report for the investigation did not disclose the source of the complaint, and the parties dispute whether the complaint was made by defendant or Dr. Shiara Ortiz-Pujols, a research fellow who worked for defendant.[1] However, it is undisputed that no individual who attended the party filed a complaint claiming plaintiff touched them inappropriately.

Defendant was interviewed twice as part of the investigation, and he told investigators that "after getting reports from people who attended the party and seeing pictures on social media, there was no doubt that he/she needed to bring it forward to discuss." But defendant claimed that he could not remember who showed him the pictures or on which social media site they were posted. Defendant testified in a deposition, contrary to the information he provided to investigators, that he did not actually see the pictures and that Dr. Ortiz-Pujols was the source of the complaint. Although the Associate Dean for Human Resources testified that

---

[1] The Court of Appeals' decision stated that Dr. Ortiz-Pujols made the complaint. *Hwang v. Cairns*, No. COA22-31, slip op. at 4–5 (N.C. Ct. App. Jan. 17, 2023). However, the record shows that the question of who made the complaint is disputed. During the UNC investigation, the investigators believed, according to their deposition testimony, that defendant himself made the complaint.

investigators routinely interview individuals with information relevant to alleged misconduct, Dr. Ortiz-Pujols was not interviewed. The final report contained no conclusion that plaintiff had violated any policy.

On 22 June 2017, before the Human Resources complaint was made, plaintiff was notified that he had earned an incentive payment of approximately $63,000 for his work at the UNC Burn Center in 2017. But supervisors withheld plaintiff's incentive payment when the formal investigation began the following week. On 9 November 2017, when the investigation concluded, plaintiff received his incentive compensation.

On 30 May 2018, plaintiff filed suit against defendant, the University of North Carolina (UNC), the University of North Carolina at Chapel Hill (UNC-CH), and the University of North Carolina Health Care System. The complaint named defendant in his individual capacity, and alleged, among other things, claims for tortious interference with contract and slander per se. Specifically, plaintiff asserted that defendant falsely accused him of "inappropriate and unprofessional behavior and sexual misconduct[.]" This included touching co-workers' breasts, taking inappropriate pictures, and making other false statements about plaintiff. Plaintiff's complaint also alleged that defendant made false statements "with malice . . . knowing they were false and fraudulent."

Each of the defendants moved to dismiss, arguing that the claims were barred by public official immunity. On 29 March 2019, the trial court found that defendant

"is not a public official entitled to assert the defense of public official immunity." The trial court further explained that even if defendant was a public official, plaintiff sufficiently alleged that defendant's "conduct was done with malice, was corrupt, and/or was done outside the scope of his official duties." For these reasons, the trial court denied the motion to dismiss.

In February 2021, all of the defendants moved for summary judgment. The trial court considered the pleadings, motions, briefs, depositions, affidavits, and other record material. These documents suggested conflicting evidence about the Human Resources complaint's origin and timing. Both human resources investigators testified at depositions that they believed defendant initiated the complaint and personally saw the photos that were the basis for the complaint to human resources. The record also contained deposition testimony from Associate Dean for Human Resources, Harvey Lineberry, PhD., that defendant had brought the complaint about plaintiff to Melina Kibbe, M.D., Chair of the Department of Surgery and defendant's immediate supervisor.

On the other hand, Dr. Ortiz-Pujols testified in her deposition that she initiated the complaint after seeing a picture on Facebook of plaintiff touching a woman's breast. She claimed that after seeing the picture, she sent a text about the picture to UNC Burn Center surgeon Samuel Jones, M.D., who then informed defendant. In her deposition, Dr. Ortiz-Pujols' asserted that only after Dr. Jones told defendant

about the text did defendant approach her to discuss the matter. Dr. Ortiz-Pujols could not produce the text message that she purportedly sent to Dr. Jones.

Dr. Jones testified in his deposition that he did not receive a text message from Dr. Ortiz-Pujols about a picture from the party. Dr. Jones further testified that defendant approached him asking what had transpired at the party. Dr. Jones told defendant that he did not attend the party because he was out of town and that he does not use social media, therefore he never saw any picture of plaintiff engaged in inappropriate activities.

Contrary to the statement he provided investigators, defendant testified at his deposition that Dr. Ortiz-Pujols told him about the picture while sitting in her cubicle, with a third, unidentified person listening. He claimed that Dr. Ortiz-Pujols was the source of the complaint and that he never saw photographs of plaintiff. According to defendant, his only role in the filing of the complaint was to "immediately report what I had heard and then escort Dr. Ortiz-Pujols to Dr. Kibbe and then essentially stand there and await further instructions."

In July 2021, the trial court held a summary judgment hearing during which defendant again contended he was entitled to public official immunity. The trial court granted defendant's motion for summary judgment, and plaintiff appealed.

The Court of Appeals affirmed the trial court, concluding that defendant was a public official entitled to immunity because he "exercise[d] 'personal deliberation, decision and judgment' in carrying out his duties." *Hwang v. Cairns*, No. COA22-31,

slip op. at 26 (N.C. Ct. App. Jan. 17, 2023) (cleaned up). Acknowledging that public official immunity does not confer total immunity from suit, the Court of Appeals then considered whether defendant's conduct was malicious, corrupt, or outside the scope of official authority such that the shield of immunity could be pierced. *Id.* at 27–28. The Court of Appeals concluded that plaintiff did not produce sufficient evidence to support an element of his claim that defendant acted with malice, *id.* at 28, and affirmed the trial court's grant of summary judgment in favor of defendant. *Id.* at 32.

Plaintiff petitioned this Court for discretionary review to determine whether the Court of Appeals erred in affirming summary judgment for defendant on the slander per se and tortious interference of contract claims. Defendant filed a conditional petition for discretionary review on the issue of whether the trial court erred by denying his motion to dismiss plaintiff's claims. We allowed plaintiff and defendant's petitions for review.[2]

## II. Analysis

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2023). Courts "must

---

[2] Defendant appealed denial of his 2019 motion to dismiss to the Court of Appeals. Defendant's cross-appeal on this issue was determined to be moot given the Court of Appeals' decision regarding summary judgment, and we conclude that defendant's conditional petition for discretionary review was improvidently allowed.

view the evidence in the light most favorable to the non-moving party." *Value Health Sols., Inc. v. Pharm. Rsch. Assocs., Inc.*, 385 N.C. 250, 267 (2023). On appeal, we review orders allowing summary judgment de novo. *James H.Q. Davis Tr. v. JHD Props., LLC*, 387 N.C. 19, 23 (2025).

In general, public officials are immune from personal liability in tort when "engaged in the performance of governmental duties involving the exercise of judgment and discretion." *Smith v. Hefner*, 235 N.C. 1, 7 (1952). The primary goals of this type of immunity are to promote "fearless, vigorous, and effective administration of government policies" and to mitigate the fear of "personal liability that may deter competent people from taking office." *Est. of Graham v. Lambert*, 385 N.C. 644, 654 (2024) (cleaned up). But public official immunity does not extend to actions performed outside of the scope of official duties or those done with malice or corruption. *See Meyer v. Walls*, 347 N.C. 97, 112 (1997) ("As long as a public officer lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption, he is protected from liability." (cleaned up)).

An employee, however, may be "personally liable for negligence in the performance of his or her duties proximately causing an injury." *Isenhour*, 350 N.C. at 610 (cleaned up). It has long been established that public employees of governmental agencies are not entitled to public official immunity because "the compelling reasons for the nonliability of a public officer, clothed with discretion, are

entirely absent." *Miller*, 224 N.C. at 787.

To determine if a position qualifies for public official immunity, this Court has identified three essential characteristics distinguishing public officials from public employees. *See Isenhour*, 350 N.C. at 610. First, public officials occupy positions "created by the constitution or statutes of the sovereignty, or . . . [where the State] delegated to an inferior body the right to create the position in question." *State v. Hord*, 264 N.C. 149, 155 (1965). Second, public officials' duties "involve the exercise of some portion of the sovereign power." *Id.* Lastly, performance of these governmental duties requires the public official to "exercise . . . judgment and discretion." *Hefner*, 235 N.C. at 7 (cleaned up). Put another way, we consider how the position was created, the nature of the power exercised by the position-holder, and the position-holder's discretion in the exercise of that power, if sovereign. All three are required for public official immunity to attach, and based upon the record here, defendant is not entitled to public official immunity.

Defendant held six positions within UNC-CH and the Health Care System. Defendant acknowledges that he acted as plaintiff's supervisor in two of his roles: division chief and Medical Director with the UNC Burn Center. Therefore, we address only these two positions.

### 1. Dr. Cairns's Positions Were Not Created by Statute or Delegated Authority and Do Not Exercise Sovereign Power.

In determining whether defendant was a public official or public employee, we first consider if (1) the position was "created by the constitution or statutes of the

sovereignty, or . . . the [State] delegated to an inferior body the right to create the position in question," and (2) the position "involve[s] the exercise of some portion of the sovereign power." *Hord*, 264 N.C. at 155.

In *Smith v. State*, 289 N.C. 303, 307 (1976), this Court examined whether a medical superintendent of a state hospital qualified as a public official or whether he was a state employee. There, the plaintiff was appointed hospital superintendent pursuant to section 122-25 of our General Statutes. *Id.* at 308. In pertinent part, the statute provided "[t]he Commissioner of Mental Health with the approval of the State Board of Mental Health, shall appoint a medical superintendent for each hospital." *Id.* at 308 (quoting N.C.G.S. § 122-25 (1964) (repealed 1973)).

In finding that the medical superintendent was an employee rather than a public official, this Court recognized that, even though the position was created by statute and the State Board of Mental Health "exercised the State's sovereign power by formulating the policies and guidelines for the operation of its mental hospital," the superintendent "was subordinate to the Board [of Mental Health]" and his "duties were to implement the Board's directives and policies." *Id.* 308–09. This distinction established that the mere statutory creation of a position does not confer public official status. Rather, the statute must also delegate some portion of the sovereign power to the position holder.

This rule was reinforced by this Court's analysis in *Isenhour*. There, this Court assessed whether a school crossing guard qualified as a public official. *Isenhour*, 350

N.C. at 605. In that case, this Court reaffirmed that municipal police officers are public officials because the General Assembly expressly delegated the exercise of general police power to towns and cities and charged police officers "with the duty to enforce the ordinances of the city or town in which [they are] appointed to serve, as well as the criminal laws of the state." *Id.* at 610–11 (citing *Hord*, 264 N.C. at 155). However, "[u]nlike the specific grant of statutory authority given municipalities to employ police officers," the General Assembly did not "specifically authoriz[e] municipalities to employ school crossing guards." *Id.* at 611. Additionally, the statutes delegating sovereign power to police officers do not likewise delegate sovereign power to crossing guards. *See id.* (noting that school crossing guards do not "exercise a legally significant portion of sovereign power in the performance of their duties"). Therefore, because the crossing guard was not specifically authorized for employment by the General Assembly and the delegation of sovereign power to police officers does not apply to crossing guards, we held that the crossing guard was not a public official. *Id.* at 611.

Here, defendant's position as division chief was not created by statute. We must, therefore, consider whether this position is created by a body authorized to delegate sovereign authority, and if the position "exercise[d] a legally significant portion of sovereign power." *Id.* at 611.

Similar to the medical superintendent in *Smith* and the school crossing guard in *Isenhour*, defendant's position as division chief is subordinate to the authority that

exercises a portion of sovereign power—here the Board of Governors. The General Assembly authorized the Board of Governors to "plan and develop a coordinated system of higher education in North Carolina," N.C.G.S. § 116-11(1) (2023), including adopting "policies and regulations" for the governance of the University of North Carolina and its constituent institutions. N.C.G.S. § 116-11(2) (2023). The Board of Governors, however, lacks authorization to delegate sovereign power, create public official positions, or expand the categories of positions that enjoy public official immunity to the network of institutions that comprise UNC. *See generally* N.C.G.S. § 116-11 (2023) (establishing the powers and duties of the Board of Governors). In addition, any delegation of authority is expressly subject to the Board of Governors' policies and regulations. N.C.G.S. §§ 116-30.1, -34(d) (2023).

Defendant's position is also subordinate to the UNC-CH Board of Trustees and Chancellor, thus even further removed from a position that is protected by public official immunity and the exercise of sovereign power. Defendant's argument that any entity that possesses sovereign power can delegate sovereign power without express authorization would dramatically expand the scope of public official immunity, and we conclude that defendant's position as division chief fails to meet the requirements for whether a person is a public official.

Defendant further contends that his position as Medical Director entitles him to public official immunity because it was created by the General Assembly in

N.C.G.S. § 116-37 (2013) (repealed 2023).[3] That provision states that the Board of Directors can hire "additional administrative and professional staff employees of the University of North Carolina Health Care System as may be deemed necessary to assist in fulfilling the duties of the office of the Chief Executive Officer, all of whom shall serve at the pleasure of the Chief Executive Officer." *Id.* Defendant argues that his exercise of discretion in this role is the same as exercising sovereign power.

We first note that the plain language of this statute identifies those assisting the CEO as employees of the Health Care System, and employees are not entitled to public official immunity. *Miller*, 224 N.C. at 787. Moreover, defendant's position as an employee is, by statute, subordinate to the CEO and the Board of Directors for the Health Care System. Under their control, defendant's position as Medical Director is similar to the medical superintendent in *Smith* and crossing guard in *Isenhour*. In addition, the multiple layers of supervision here make the Medical Director far removed from sovereign power. As such, the Medical Director fails to qualify as a public official.

Thus, defendant has failed to establish that either of his positions meet the first two criteria for whether they are public official positions. This failure shows that defendant, when acting in these positions, is not entitled to public official immunity.

### 2. Dr. Cairns Did Not Exercise Discretion in the Performance of Sovereign Power.

---

[3] N.C.G.S. § 116-37 was repealed effective 3 October 2023; however, the statute was in force at all relevant times during this case.

While defendant does not qualify for public official immunity, given the emphasis the Court of Appeals placed on the third characteristic, we find it pertinent to discuss exercise of discretion in the performance of sovereign power. *See Hefner*, 235 N.C. at 7.

Public official immunity applies to discretionary acts that "requir[e] personal deliberation, decision and judgment." *Isenhour*, 350 N.C. at 610 (quoting *Meyer*, 347 N.C. at 113). But discretionary conduct by itself is not protected by public official immunity; only when the discretionary conduct is in the exercise of sovereign power does it fall within the scope of public official immunity. *See Meyer*, 347 N.C. at 112.

In both relevant roles, defendant certainly exercised broad discretion in caring for patients and managing employees. But in concluding that plaintiff was a public official entitled to public official immunity, the Court of Appeals only considered whether defendant's positions required any exercise of discretion. In so doing, the Court of Appeals relied on dicta in *White v. Trew*, 366 N.C. 360, 363 (2013), to conclude that mere use of decision and judgment entitles one to public official immunity. But *White* was decided on sovereign immunity, not public official immunity. *See id.* at 366 (holding that the plaintiff's claims were barred by sovereign immunity). The discussion of public official immunity in *White* was "unnecessary to the determination of [the] case, and must be regarded as *obiter dicta*." *Washburn v. Washburn*, 234 N.C. 370, 373 (1951).

The Court of Appeals erred by failing to consider whether defendant's positions arose by statute or identify any sovereign power exercised by defendant and their determination on the basis of characteristic three alone was error.

For the reasons stated above, we conclude that defendant's position as division chief does not arise under the constitution, statute, or delegated authority of the State, and defendant's conduct at issue did not involve the discretionary exercise of sovereign power. Further, defendant's position as Medical Director does not involve the discretionary exercise of sovereign power. Neither position shields his conduct from liability under the doctrine of public official immunity, and we reverse the Court of Appeals.

## III. Conclusion

Defendant is not a public official, and he is not entitled to public official immunity. Having resolved the narrow issue over which we granted discretionary review, we decline the parties' invitation to address additional issues, and we remand this matter to the Court of Appeals for consideration of the parties' outstanding arguments.

REVERSED AND REMANDED.

Justice RIGGS concurring.

I join with the majority's holding that Dr. Cairns does not, as a matter of law, enjoy public official immunity for acts committed while supervising employees at the UNC Burn Center. However, the majority ends its analysis on the question of public official immunity without addressing other issues on which we allowed discretionary review. I write separately because I fear our decision will sow confusion on remand because of the majority's approach to simply ignoring the conclusions reached by the Court of Appeals beyond the issue of public official immunity.

The majority states that it resolves the narrow issue upon which we allowed discretionary review. But, in our Order we allowed review of the following issues:

> On the plaintiff's petition for discretionary review filed 21 February 2023, the Court hereby allows the petition as to Dr. Hwang's first proposed issue: Did the Court of Appeals err in affirming the order granting Defendant Cairns's Motion for Summary Judgment? This issue is only allowed as to plaintiff's slander *per se* and tortious interference of contract claims against defendant Cairns.

> On defendants' conditional petition for discretionary review filed 6 March 2023, the Court hereby allows defendants' petition as to the sole issue presented: Did the trial court err in denying defendants' initial motions to dismiss plaintiff's amended complaint under Civil Rules 12(b)(1), 12(b)(2)[,] and 12(b)(6). This issue is only allowed as to defendant Cairns's immunity defenses as they apply to Dr. Hwang's claims for slander *per se* and tortious interference with contract.

*See Hwang v. Cairns,* 385 N.C. 298 (2023).

-17-

Therefore, this Court should address whether the evidence in the record, taken in the light most favorable to the non-moving party, demonstrates a genuine issue of material fact such that the trial court erred in granting summary judgment to Dr. Cairns for Dr. Hwang's claims for slander per se and tortious interference with contract. This Court obviously could decide that discretionary review was improvidently allowed, but we did not do so and cannot just ignore issues we have explicitly decided to address.

The Court of Appeals concluded that Dr. Hwang "cannot demonstrate that [Dr.] Cairns acted contrary to his duty to report" and that Dr. Hwang "is unable to show that [Dr.] Cairns acted with [ ] malice." *Hwang v. Cairns*, No. COA22-31, 2023 WL 192912, at *11 (N.C. Ct. App. Jan 17, 2023) (unpublished). To reach these conclusions, the Court of Appeals had to resolve or disregard disputed facts, which it is not permitted to do. Specifically, the Court of Appeals inappropriately resolved the question of who made the complaint and whether it was made for malicious purposes. *Id.* Because these conclusions implicate whether Dr. Cairns is entitled to qualified immunity or whether Dr. Hwang is entitled to pursue further relief on his claim for slander per se, the better course is to address the Court of Appeals' erroneous resolution of disputed facts rather than asking the trial court to speculate whether our reversal of the Court of Appeals' decision also reverses these conclusions.

While curiously omitting our most recent case on public official immunity, *Bartley v. City of High Point*, 381 N.C. 287 (2022), the majority nonetheless

acknowledges that "public official immunity generally shields qualifying individuals from personal liability for tortious conduct in execution of discretionary acts committed while acting within the scope of his or her governmental duties." *See* majority *supra* introduction. Importantly, the doctrine of public official immunity does not extend to "employee[s] of a governmental agency . . . since the compelling reasons for the nonliability of a public officer, clothed with discretion, are entirely absent." *Meyer v. Walls*, 347 N.C. 97, 113 (1997) *(*quoting *Miller v. Jones*, 224 N.C. 783, 787 (1945)).

An employee "is personally liable for negligence in the performance of his or her duties proximately causing an injury." *Isenhour v. Hutto*, 350 N.C. 601, 610 (1999) (cleaned up). And Dr. Cairns is an employee responsible for his negligent or intentional acts. *See Miller*, 224 N.C. at 788 ("[I]t is a broad general rule that any person who violates a legal duty he owes to another is liable for the natural and probable consequences of his act or omission, and exceptions to that rule should not, by mere judicial rationalization, be extended beyond the recognized public policy out of which they spring.").

Nonetheless, on a claim of slander per se, employees may be protected by qualified immunity "where (1) a communication is made in good faith, (2) the subject and scope of the communication is one in which the party uttering it has a valid interest to uphold," and "(3) the communication is made to a person or persons having a corresponding interest, right, or duty." *Presnell v. Pell*, 298 N.C. 715, 720 (1979)

(emphases omitted).  Even if qualified privilege applies, Dr. Hwang can still recover "if he can prove that the words were not used *bona fide*, but that the defendant used the privileged occasion artfully and knowingly to falsely defame the plaintiff." *Ponder v. Cobb*, 257 N.C. 281, 293 (1962).

At summary judgment, Dr. Hwang put forth evidence that Dr. Cairns made the complaint for malicious purposes.  *See Koontz v. City of Winston-Salem*, 280 N.C. 513, 518 (1972) ("The issue is denominated 'genuine' if it may be maintained by substantial evidence.").  At this procedural posture, Dr. Hwang does not need to "convince the court that he would prevail on a triable issue of material fact but only that the issue exists." *Lowe v. Bradford*, 305 N.C. 366, 370 (1982).

At summary judgment then, the question for this slander per se claim is whether Dr. Hwang has forecast evidence of each element of the slander per se claim and has also forecast evidence that qualified immunity does not apply.  *See Creech v. Melnik*, 347 N.C. 520, 526 (1998) ("To overcome a motion for summary judgment, the nonmoving party must then 'produce a forecast of evidence demonstrating that the [nonmoving party] will be able to make out at least a *prima facie* case at trial.' " (alteration in original) (quoting *Collingwood v. G.E. Real Est. Equities, Inc.*, 324 N.C. 63, 66 (1989))).  At this procedural posture, "the movant's papers are carefully scrutinized [and] those of the adverse party are indulgently regarded." *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (internal citations omitted).  Because Dr. Cairns moved for summary judgment, the trial court should view the evidence and make all

inferences in the light most favorable to Dr. Hwang. *See id.* ("All facts asserted by the adverse party are taken as true, and their inferences must be viewed in the light most favorable to that party." (internal citations omitted)).

On the claim for slander per se, Dr. Hwang must forecast evidence that: (1) Dr. Cairns spoke "defamatory words which tended to prejudice [Dr. Hwang] in his reputation, office, trade, business or means of livelihood or hold him up to disgrace, ridicule or contempt; (2) the statement was false; and (3) the statement was published or communicated to and understood by a third person." *West v. King's Dep't Store, Inc.*, 321 N.C. 698, 703 (1988). And then Dr. Hwang must forecast evidence that, because Dr. Cairns manufactured the complaint "artfully and knowingly to falsely defame the plaintiff," Dr. Cairns is not entitled to qualified privilege. *Ponder,* 257 N.C. at 293.

Dr. Hwang forecast evidence from the investigation report and the depositions of the investigators indicating that the source of the complaint was Dr. Cairns, not Dr. Ortiz-Pujols. Dr. Hwang forecast evidence that Dr. Cairns significantly changed his testimony between his interview with the investigators and his deposition in this case. In his interview with the investigators, Dr. Cairns stated that he personally saw pictures of misconduct. In contrast, in his deposition, Dr. Cairns testified that he never saw any pictures of sexual misconduct. This evidence, coupled with Dr. Cairns' pattern of harassing and threatening Dr. Hwang and other medical doctors who left the institution, may support an inference at this permissive stage that Dr.

Cairns was manufacturing a complaint rather than bringing forth a valid concern. Dr. Hwang also forecast evidence that he was prejudiced or injured by these false statements because: the University withheld compensation due to him for five months; he would be required to disclose the allegation to prospective employers and medical licensing boards; and the accusation led to stress-related health issues.

Assuming, without deciding, that privilege applies here, Dr. Hwang forecast evidence that Dr. Cairns acted with malice and proof of malice defeats the element that the statement was made in good faith. *See Ponder*, 257 N.C. at 294 ("[M]alice may be proved by some extrinsic evidence, such as ill-feeling or personal hostility or threats and the like on the part of the defendant towards the plaintiff." (cleaned up)). Dr. Hwang produced numerous depositions and affidavits from UNC Burn Center employees in which those employees attested that Dr. Cairns previously threatened or made false complaints for the purpose of damaging the professional reputations of doctors, nurses, and physician assistants at the UNC Burn Center. Furthermore, the deposition testimony supports an inference that Dr. Cairns acted in a threatening and hostile manner towards Dr. Hwang. Last, Dr. Hwang produced deposition and affidavit evidence from several witnesses who attended the party at issue and attested that there was no basis for a complaint. Generally, issues of witness credibility should not be resolved by the "trial court at summary judgment." *N.C. Farm Bureau Mut. Ins. Co. v. Herring*, 385 N.C. 419, 425–26 (2023).

Thus, on remand, the trial court must consider the forecast of evidence to

determine whether qualified immunity is applicable and whether there is a triable issue of fact for a jury on slander per se.  On the claim of tortious interference with contract, because Dr. Cairns is not entitled to public official immunity, Dr. Hwang's claim for tortious interference with a contract is not barred.

Justice EARLS joins in this concurring opinion.